**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Israel RUIZ, Jr., Defendant–Appellant.**

**No. 464, Docket 89–1255.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 16, 1989.
Decided Jan. 10, 1990.

Kerri Martin Bartlett, Asst. U.S. Atty., S.D.N.Y., New York City (Benito Romano, U.S. Atty. S.D.N.Y., Edward D. Saslaw, Sp. Asst. U.S. Atty., Maria T. Galeno, Asst. U.S. Atty., New York City, of counsel), for plaintiff-appellee.

Christine E. Yaris, New York City, for defendant-appellant.

Before LUMBARD, FEINBERG, and MESKILL, Circuit Judges.

LUMBARD, Circuit Judge:

Israel Ruiz appeals from the judgment of conviction of the District Court for the Southern District of New York, Peter K. Leisure, *Judge.* Following a jury trial, Ruiz was convicted of violating 18 U.S.C. § 1014 (1988) by making false statements in loan applications to Chemical Bank, a federally insured institution. Judge Leisure imposed a sentence of eleven months' imprisonment, five of which were suspended; three-years' probation; and 500 hours of community service. Ruiz is at liberty pending appeal. We affirm.

I.

In January 1975, Ruiz began serving as a New York State Senator representing the Thirty-second Senatorial District in the Bronx. Later that year he founded the Alliance for Progress, Inc., a non-profit corporation that sponsored construction and renovation of residential and commercial properties. The Alliance was funded, in part, under a state program allowing elected officials to designate a special interest project to receive state funds.

One of the Alliance's projects involved a commercial development at 880 River Avenue in the Bronx, known as the Yankee Mall. The Alliance, through a subsidiary, the 880 River Avenue Holding Corporation (880 Corporation), purchased the building at that location and sought additional funding from the state's Urban Development Corporation (UDC). UDC entered into a purchase-leaseback arrangement with the Alliance whereby UDC agreed to purchase the property and lease it to the Alliance

with a buy-back option at the lease's termination. The Alliance also arranged with Perme Construction Corporation to renovate the property. Perme was headed by Maxiste Brito.

As with other Alliance development projects, Ruiz arranged with the purchaser of the property, in this case the Alliance subsidiary, to provide consulting services for which he would be compensated. Ruiz assured the 880 Corporation that the consulting arrangement did not violate any ethics obligations imposed under New York law by virtue of his position as a state senator. Ruiz received $40,000 for his services on the Yankee Mall project.

*Correspondence with the Senate Ethics Committee*

Because of the potential ethical problems regarding his consulting activities on the Yankee Mall and other projects, Ruiz regularly corresponded with the chairmen of the Senate Ethics Committee to obtain its conditional approval. Ruiz wrote two such letters, in November 1979 and February 1981, to Senators John Marchi and Christopher Mega, respectively, each of whom subsequently communicated his approval of the consulting arrangements. On June 8, 1983, however, Ruiz wrote to the new chairman, Senator William Steinfeldt, who initially responded to Ruiz that he could "neither approve nor disapprove" of the arrangements. Later, in September 1983, Steinfeldt wrote Ruiz a more detailed letter, stating, in part, that the ethics committee could not "give [Ruiz] a blanket assurance of a lack of conflict within the requirements of the public officers law and the legislative law." Steinfeldt also suggested that the arrangements "may be on the verge of and may be actually within the practice of law."

During an audit of the Yankee Mall project in the spring of 1984, the UDC discovered a $37,500 payment to Ruiz by the Alliance and requested further information. Ruiz supplied, in response, copies of the letters from Senators Marchi and Mega but not the two letters from Senator Steinfeldt. In April 1986, a federal grand jury investigating Ruiz's consulting activities subpoenaed his correspondence with the Ethics Committee.[1] From the appropriate file, Ruiz's staff retrieved the Marchi and Mega letters but not the Steinfeldt letter. Upon being advised by one staff member that the June 1983 letter to Steinfeldt was missing, Ruiz directed his staff to obtain the letter from the Ethics Committee itself. Later, that committee, in response to a subpoena, delivered to the Government all correspondence relating to Ruiz, including both 1983 letters from Steinfeldt to Ruiz. The Government informed Ruiz's attorney of the discrepancy between the letters Ruiz had supplied and those supplied by the committee. Ruiz then directed his staff again to examine the appropriate file, and the staff this time produced the September 1983 Steinfeldt letter.

Appearing before the grand jury in May 1986, Ruiz was asked about the September 1983 letter and why he had not supplied it when subpoenaed. Ruiz stated repeatedly that, as of the date of the subpoena, he had neither seen nor possessed the letter.

*The Two Loan Applications*

In October 1984, Ruiz applied to Chemical Bank for a personal loan of $115,000, of which $65,000 was to be invested in construction of a supermarket at Yankee Mall, and the balance in a residential project sponsored by the Alliance. On one of the documents submitted in support of his loan request, Ruiz represented, under the category "Other Assets (Itemize)," a "supermarket at 880 River Ave. investment" worth "$125,000." Despite this and the other supporting documentation, Robert Pearson, the branch manager, requested further information regarding the purpose of the loan and the method of repayment. Ruiz did not provide that information.

1. As a result of a joint investigation by the U.S. Attorney for the Southern District and the New York State Attorney General, Ruiz was first investigated by a federal grand jury impaneled in March 1986. The grand jury failed to issue an indictment before its term expired in March 1988. A second grand jury, referred to in the briefs as the "March 1987 Additional Grand Jury," began investigating Ruiz in 1988 and ultimately returned the instant indictment.

In April 1985, Ruiz made a second loan request, this time for $150,000 to complete the supermarket, in the name of a corporation he wholly owned, Able Grocery Corporation. On a financial statement submitted in support of the request, Ruiz listed, again under the category "Other Assets (itemize)," a "Supermarket at 880 River Avenue investment" worth "$139,000." Once again Pearson requested further information, including a proposed business plan for the supermarket, none of which Ruiz supplied.

Both loan applications failed to list a $30,000 debt Ruiz owed to Burton Schoenbach, a friend and former Senate staff employee, for a 1983 loan.

In May 1985—after twice being unsuccessful in applying for Chemical Bank loans—Ruiz finally obtained part of the money he sought through a loan from Maxiste Brito, the head of Perme Construction. Brito earlier had borrowed $75,000 from Chemical Bank, in Perme's name, and loaned $50,000 to Ruiz ostensibly to help Ruiz repair damage to his house from faulty plumbing. The Alliance secured Brito's loan by a $75,000 certificate of deposit to enable Perme to complete construction of the 880 River Avenue project.

*The Indictment*

On August 23, 1988, the second grand jury returned a three-count indictment against Ruiz. Count One was based on the allegedly false statements contained in the October 1984 loan application. Count Two alleged two material misrepresentations in the April 1985 loan request: his failure to identify the $30,000 debt to Schoenbach and his valuation of the supermarket at $139,000 when his actual interest was only $35,000. Count Three alleged that Ruiz committed perjury before the first grand jury when he stated that at the time of the subpoena he had had neither knowledge nor possession of the Steinfeldt letter. The jury convicted Ruiz on Count Two and acquitted him on Counts One and Three.

## II.

### A. *Abuse of the Grand Jury Process*

In November 1988, Ruiz moved for dismissal of the indictment or for a hearing, asserting that he was prosecuted because of political animosity and as a vindictive response to the Government's failure to obtain an indictment from the first grand jury that investigated Ruiz. The court denied the motion. Ruiz argues that Judge Leisure's refusal to require the Government to respond to Ruiz's allegations by affidavit or at a hearing is reversible error.

Although there is no indication that Ruiz requested to appear before the second grand jury, he complains that the prosecutor's failure to call him to testify is indicative of the Government's abuse of the process. Ruiz appeared five times before the first grand jury, but before the second the Government offered transcripts of his earlier testimony instead of calling Ruiz to testify. Ruiz argues that the use of the transcripts prevented the grand jury from assessing his credibility and allowed the prosecutor to mischaracterize the earlier testimony without giving Ruiz a chance to explain it.

■ Ruiz also claims that the Government was biased against him because he is an Hispanic legislator who has taken many unpopular positions, and because it had unfairly targeted politicians in light of recent prosecutions of alleged corruption among New York City political figures.

■ Ruiz argues that, at the least, the district court should have required the Government to answer his objections. Were Ruiz better able to substantiate his allegations, there might have been sufficient reason to require the Government to respond. As it was, there was no showing that Ruiz's indictment was caused by improper actions of the Government. Moreover, with respect to Count Two, any error respecting the charge is rendered harmless by Ruiz's conviction beyond a reasonable doubt. *See United States v. Mechanik*, 475 U.S. 66, 70–71, 106 S.Ct. 938, 941, 89 L.Ed.2d 50 (1986). With respect to the other counts, Ruiz's acquittal renders any error moot. *See United States v. Helmsley*, 864 F.2d 266, 269 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 2063, 104

L.Ed.2d 628 (1989). Additionally, as Judge Leisure noted, it is well established that defendants have no constitutional right to appear before a grand jury. *United States v. Ciambrone*, 601 F.2d 616, 622–23 (2d Cir.1979). We find no error in the district court's refusal to require the Government to respond to Ruiz's conclusory and unsupported allegations.

### B. *The Severance Motion*

Before trial, Ruiz moved, pursuant to Fed.R.Crim.P. 8(a), to sever Counts One and Two (relating to false statements) from Count Three (relating to perjury). Judge Leisure denied the motion. Ruiz challenges that ruling, arguing that joinder was prejudicial because the jury's verdict—convicting on Count Two but acquitting on One and Three—"was so clearly a compromise." He asserts, in support of his position, that the verdict was rendered on a Friday afternoon, that it came on the heels of an instruction issued by the court in response to the jury's stated confusion on certain aspects of the case, and that it was factually impossible, absent compromise, for the jury to acquit on one false statement count and not the other. Ruiz acknowledges that a compromise verdict does not of itself warrant reversal, as we recently held, *see United States v. Alvarado*, 882 F.2d 645 (2d Cir.1989), but argues that compromise is a factor that should be considered in deciding whether a denied severance was harmless.

■ Our scrutiny of the district court's denial of a Rule 8 motion to sever requires a twofold inquiry: whether joinder of the counts was proper, and if not, whether misjoinder was prejudicial to the defendant. Reversal is warranted only if the defendant prevails on both prongs. *See generally United States v. Turoff*, 853 F.2d 1037, 1042–43 (2d Cir.1988). With regard to the first prong, we have held that "offenses may be joined in a single indictment when they are (1) 'based on the same act or transaction,' or (2) based 'on two or more acts or transactions connected together or constituting parts of a common scheme or plan,' or (3) 'of the same or similar charac-

ter.'" *Id.* at 1042, quoting Fed.R.Crim.P. 8(a).

■ Contrary to Ruiz's contention, the acts underlying the false statement and perjury counts have sufficient logical connection to warrant joinder in a single trial: All three relate to Ruiz's extra-senatorial activities through the Alliance. The false statement counts focused on Ruiz's attempt to procure financial support from Chemical Bank for proposed development at the Yankee Mall. Similarly, the perjury count focused on Ruiz's alleged attempts to mislead the grand jury about his attempts to secure Senate Ethics Committee approval of his consulting fees from the Alliance projects. The actions underlying all three counts were part of a common scheme or plan and, as all involved substantial alleged dishonesty, surely were "of the same or similar character." Accordingly, joinder of the false statement counts with the perjury count in a single indictment was proper.

### C. *The Government's Use of Peremptory Challenges*

Ruiz claims that the Government violated his rights to equal protection under the fifth amendment and to trial by an impartial jury under the sixth amendment by its use of peremptory challenges during jury selection to strike three Hispanics, three blacks, and one white. The jury ultimately impaneled was comprised of eight whites, three blacks, and one Hispanic.

1. *Fifth Amendment* In *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that a prosecutor's discriminatory use of peremptories violates the defendant's right to equal protection under the fifth amendment. Recognizing that defendants would rarely be able to present direct evidence proving a prosecutor's unlawful intent, the Court accepted circumstantial evidence to show discrimination. The defendant initially must establish a prima facie case, which involves several steps. First, the defendant "must show that he is a member of a cognizable racial group and that the prosecutor has exercised peremptory challenges to remove from the venire members of the

defendant's race." *Id.*, citing *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977). Second, the defendant may rely on the fact that "peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.'" 476 U.S. at 96, 106 S.Ct. at 1723, quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1963). Third, the defendant must show "that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." 476 U.S. at 96, 106 S.Ct. at 1723. Once the defendant clears the prima facie hurdle, the burden shifts to the government "to offer neutral explanations for challenging the jurors." *United States v. Alvarado*, 891 F.2d 439, 443 (2d Cir.1989), citing *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723. After entertaining the prosecutor's explanations, the court, bearing in mind the defendant's burden of persuasion, must decide the ultimate issue of discrimination. *Alvarado*, 891 F.2d at 442.

■■■ The Government used three of its six peremptories to challenge Hispanic veniremen.[2] At the conclusion of *voir dire*, Ruiz moved for a mistrial based on the Government's allegedly discriminatory use of the peremptories. Judge Leisure found, and we agree, that Ruiz had made a sufficient initial showing of discrimination under *Batson* to require the prosecutor to come forward with neutral reasons justifying the challenges. The Assistant United States Attorney, Maria Galeno, provided the following explanations as to each challenged Hispanic venireman:

* Patricia Rosa: The prosecutor challenged Rosa because she made "facial expressions" during *voir dire* suggesting "that she really did not want to sit." Galeno added that both she and a Government investigator sitting at the counsel table perceived that Rosa was staring strangely at them, and that Rosa

had not been "particularly articulate" in responding to the Government's questions.

* Joseph Rivera: Galeno stated that the Government struck Rivera because, in response to Judge Leisure's questioning, he "seemed willing to go along with anything that was said and didn't seem to have the strength of his convictions." She also noticed that Rivera "seemed ... to be shaking his head at inappropriate times."

* Enrique Sabator: The Government struck Sabator because of his participation in two prior cases that resulted in hung juries. Galeno termed him "a professional hung juror."

Based on these explanations, Judge Leisure denied Ruiz's motion, finding that the Government had proffered "sufficient neutral, specific and reasonable explanations."

■■■ The findings of the trial judge as to the credibility of the government's explanations ordinarily are entitled to "great deference." *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. at 1724 n. 21. *See also United States v. Biaggi*, 853 F.2d 89, 96 (2d Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989). And if, as in this case, the court itself participated in the *voir dire*, we give those findings "especial deference." *Biaggi*, 853 F.2d at 96. While the government must do more than simply deny any discriminatory motive or affirm its good faith, "the prosecutor's explanation need not rise to the level justifying excuse for cause." *Batson*, 476 U.S. at 97–98, 106 S.Ct. at 1723.

Contrary to Ruiz's contention, our task is not to weigh the defendant's asserted inferences of discrimination against the prosecutor's explanations of non-discrimination and decide which side is more likely correct. Rather, we review the findings of the factfinder, who has the obligation to assess the credibility of the prosecutor's explanations in light of the defendant's prima facie case. Given the deferential standard of review required by *Batson* and because of Judge

---

**2.** *Batson* makes clear that under the fifth amendment, defendants have standing to challenge only peremptories used to exclude members of their own racial group. 476 U.S. at 96, 106 S.Ct. at 1722.

Leisure's participation in *voir dire*, we conclude that the denial of the motion for mistrial was not erroneous.

■ 2. *Sixth Amendment* Ruiz also challenges the Government's exercise of peremptories under the sixth amendment. Although the Supreme Court declined to address the issue in *Batson, see* 476 U.S. at 84–85 n. 4, 106 S.Ct. at 1716 n. 4, we have held that the sixth amendment encompasses claims alleging discriminatory use of peremptories. *See Roman v. Abrams*, 822 F.2d 214 (2d Cir.1987); *see also McCray v. Abrams*, 750 F.2d 1113 (2d Cir.1984), *vacated and remanded*, 478 U.S. 1001, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986), *appeal dismissed*, No. 84–2026 (2d Cir. Oct. 23, 1986). The sixth amendment, we stated in *Roman*, guarantees a defendant "not that he will have a petit jury of any particular composition but that he will have the *possibility* of a jury that reflects a fair cross section of the community." 822 F.2d at 229 (emphasis in original). To that end, when the prosecutor "starts out to eliminate that possibility" by exercising peremptory challenges in a discriminatory fashion, "that constitutionally guaranteed possibility" is eliminated and the defendant's rights are impaired. *Id.*

Ruiz asserts that sixth amendment principles permit him to challenge the exclusion of potential jurors from minority groups other than his own—in this case, the three challenged black veniremen.[3] We reject Ruiz's contentions because we find the prosecutor's reasons for challenging the black veniremen acceptable.

Galeno offered the following explanations:

* Deborah Simms: Simms was struck because she stated that her husband works in real estate in the Bronx. The Govern-ment "was concerned that she might have known persons or places ... which she might have brought improperly to bear upon her deliberations."

* Annette Brown: The Government was concerned about Brown's "manner in failing to be clear about her employment, and exactly what her responsibilities and duties were."

* Charles Raymond: Galeno objected to Raymond because "he was sitting in the box with a toothpick in his mouth, which raised somewhat of a question ... as to the seriousness with which he considered the proceedings."

As with the Hispanic veniremen, Judge Leisure accepted the Government's explanations. Applying the same standard of review as under *Batson* and *Biaggi*, we see no reason not to accept Judge Leisure's findings.[4]

### D. *The Prosecutor's Comments on Summation*

■ One essential component of the Government's case on Count Two related to Ruiz's declaration on the second Chemical Bank loan application, in April 1985, that his interest in the 880 River Avenue property was worth $139,000. Ruiz defended that figure by pointing to his alleged leasehold interest in the supermarket to be built there. The Government contended that no valid lease existed, and therefore Ruiz's interest amounted to only $35,000—the amount he actually had invested in the property.

In her initial summation, Galeno argued: "There was no lease in October of 1984 [the date of the first loan application], and there was no lease in April of 1985." Ruiz's counsel, in his summation, countered by stating that one of the witnesses, Dorcas Traverzo, remembered typing a lease at

3. This issue is currently before the Supreme Court, *see Holland v. Illinois*, No. 88–5050, 58 U.S.L.W. 3279 (Oct. 31, 1989) (summary of oral argument), and this court has not addressed the question.

4. Given this conclusion, we need not address the question of "whether the group alleged to have been impermissibly challenged is 'significantly underrepresented' in the jury that con-victed the appellant." *Alvarado*, 891 F.2d at 445. That question arises only when the prosecutor "has succeeded in excluding a cognizable group from the jury by the discriminatory use of his peremptory challenges...." *Roman*, 822 F.2d at 229. In this case, we see no reason for the district court not to have accepted the prosecutor's neutral explanations with regard to all veniremen.

**508**

Ruiz's direction, even though Ruiz had not produced it at trial. The prosecutor, in her rebuttal summation, argued in turn: "If that lease was signed and executed, Senator Ruiz would have a copy of it, right? You can bet if there was a prior lease you would have seen it."

Ruiz argues that this last statement was prejudicially misleading because Galeno knew or should have known that in an October 1982 letter, the Alliance and Able Grocery Corporation, wholly owned by Ruiz, had executed a lease that was fully enforceable under New York landlord-tenant law. Because the letter was among the materials provided by the Government during discovery, Ruiz argues, the prosecutor should be deemed to have known of its existence, making her comments on summation deliberate misrepresentation.

 Three weeks after trial, Ruiz, pointing to the existence of this alleged lease, moved for a new trial, asserting two alternative grounds: either that Galeno's statement constituted prosecutorial misconduct, or that the failure of Ruiz's trial counsel to seek admission of the letter into evidence constituted ineffective assistance of counsel.

Judge Leisure denied the motion. He found, first, that no prosecutorial misrepresentation occurred. The letter was not intended as a lease, and even if it were so intended, it was not contemplated to represent an interest of Ruiz because it had been signed by Ruiz's uncle, not Ruiz himself. On the ineffective assistance claim, he found that counsel's failure to introduce the letter was a plausible trial strategy given its limited probative value. Judge Leisure also reiterated his comment, made at the close of trial, regarding the high quality of representation provided by counsel for both sides.

We find these conclusions amply supported by the evidence. There is no prejudice apparent from the prosecutor's comments. As Judge Leisure observed, the jury could have convicted Ruiz on the false statement count even if all evidence of the claimed $139,000 interest was disregarded: The failure to disclose the indebtedness to Schoenbach would have been sufficient to support a conviction. Further, Ruiz was well aware of the importance of the alleged lease at trial. Much prosecution testimony was directed to the issue, regarding which Ruiz's counsel conducted extensive cross-examination. Ruiz also declined the opportunity, before summations, to introduce the letter-lease, which was indisputably in his possession following discovery.

Ruiz's contention that the evidence was insufficient to support the conviction does not merit discussion.

Conviction affirmed.