**Raymond Joseph ECHLIN, Ronald Bishop (92–2009); Donald Johnson (92–2539), Petitioners–Appellees,**

v.

**Robert LeCUREUX, Respondent–Appellant.**

Nos. 92–2009, 92–2539.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 29, 1993.

Decided June 10, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Aug. 17, 1993.

---

Carl Ziemba (argued and briefed), Detroit, MI, Frederick D. Doherty, Jr. (argued and briefed), Honigman, Miller, Schwartz & Cohn, Lansing, MI, for Raymond Joseph Echlin, Ronald Richard Bishop.

Kathleen Davison Hunter, Asst. Atty. Gen. (argued and briefed), Office of the Atty. Gen., Habeas Div., Lansing, MI, for Robert LeCureux.

R. Steven Whalen (argued and briefed), Detroit, MI, for Donald Johnson.

Before: RYAN and SILER, Circuit Judges; and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

This is a consolidated appeal by the State of Michigan from an order of the district court granting habeas corpus relief to Michigan prisoners on the ground that the prosecutor at the petitioners' state trial denied these white petitioners equal protection of the laws by exercising peremptory jury challenges to strike prospective jurors of the petitioners' own race on account of their race. The petitioners were convicted of conspiracy to murder a black man who was living in a white neighborhood with a white woman and her child. The prosecutor exercised nineteen of twenty-one peremptory challenges against white members of the venire.

Four years after the petitioners' 1982 convictions but while their cases were on direct appeal, the Supreme Court held in *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), that a state prosecutor violated a black defendant's Fourteenth Amendment equal protection rights by using peremptory challenges to remove black potential jurors solely on account of their race. *Id.* at 89, 106 S.Ct. at 1719. For *Batson* to apply, the defendant must show that he is a member of a cognizable racial group, that is, "that he is a member of a racial group capable of being singled out for differential treatment." *Id.* at 94, 106 S.Ct. at 1721. As in all equal protection cases, the government action must be shown to have been "purposeful" or "intentional discrimination." *Id.* at 93, 106 S.Ct. at 1721 (quoting various Supreme Court decisions). The Court also detailed the requirements for a defendant to make out a prima facie case of discriminatory selection of jurors. *Id.* at 96–97, 106 S.Ct. at 1722–23.

The State makes four arguments on appeal, including the contention that the extension of *Batson* sought by the petitioners and applied by the district court constituted a "new rule" that the district court had no power to apply retroactively in this case.

I.

We trace briefly the long history of this case that now extends over eleven years.

A.

The Michigan Court of Appeals consolidat-

ed Echlin and Bishop's [1] appeals and initially held that *Batson* was not to be applied retroactively and even if it was, the petitioners had failed to establish a prima facie case of discrimination. After the Supreme Court ruled in *Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) that *Batson* applied retroactively to cases on direct appeal when *Batson* was announced, the Michigan Supreme Court vacated the judgment of the court of appeals and remanded the case for reconsideration. The appeals court found that the record in the case was not adequate to ascertain whether the petitioners had made out a prima facie case and remanded the case to the trial court for a determination on this issue.

The trial court rejected the petitioners' claims, finding that the venire and jury reflected a cross-section of the population of Detroit, and thus concluding that they failed to make out a prima facie case of purposeful discrimination. After hearing arguments of counsel, the court issued written findings in which the court concluded that it found nothing to indicate that the prosecutor made challenges solely on the basis of race.

Upon resubmission to the appeals court for final decision, that court affirmed the trial court's finding that the petitioners had not made out a prima facie case, noting the fact that the prosecutor did not remove all the white members of the jury was "strong evidence against a showing of discrimination." The court rejected the petitioners' claim that the prosecutor's statements during voir dire regarding the defendants' peremptory strikes of black prospective jurors supported an inference of discrimination.

### B.

The petitioners then filed this habeas corpus action. The district court disagreed with the Michigan courts, finding that the petitioners had established a prima facie case of discrimination. It then held an evidentiary hearing to give the State an opportunity to show race-neutral reasons for the peremptory strikes. The district court declined to

accord the customary deference to the state court findings stating *inter alia,* that: (1) there was no support in the record for the state courts' conclusions that the jury and venire represented a cross-section of the population of Detroit; (2) the statistics regarding the percentage of the prosecutor's challenges against white persons "clearly suggest[ed] an inference of discrimination" warranting a finding that the petitioners had made out a prima facie case; (3) the trial court never held an evidentiary hearing before finally resolving the *Batson* claim; and (4) the Michigan courts "gave short shrift" to the petitioners' *Batson* claims.

Before disposition of the issue whether the petitioners carried their burden of proving purposeful discrimination, the district court by memorandum opinion and order denied the State's motion to dismiss on the grounds that *Batson* was not retroactive and that the petitioners had no standing to raise *Batson* claims. The court decided the standing issue under *Batson* and therefore found it unnecessary to decide whether the petitioners relied upon a new rule. Although the prosecutor offered neutral reasons for the strikes at the six-day district court hearing, on July 31, 1992, the court determined that the prosecutor had stricken the prospective jurors based on their race.

The court thus granted the writs of habeas corpus and ordered the State to retry the petitioners within ninety days or release them from custody. The district court stayed its order granting the writs pending appeals to this court.

### II.

The Supreme Court discussed at length the question of the retroactivity of new rules of constitutional procedure in *Teague v. Lane,* 489 U.S. 288, 299–310, 109 S.Ct. 1060, 1068–75, 103 L.Ed.2d 334 (1989). The Court stated:

> Retroactivity is properly treated as a threshold question, for, once a new rule is applied to the defendant in the case an-

---

**1.** Johnson's consolidated appeal followed a separate track, but requires no different treatment here.

nouncing the rule, evenhanded justice requires that it be applied retroactively to all who are similarly situated.

*Id.* at 300, 109 S.Ct. at 1069–70. Thus, we turn first to the retroactivity issue as a threshold question.

### A.

In *Allen v. Hardy*, 478 U.S. 255, 106 S.Ct. 2878, 92 L.Ed.2d 199 (1986), the Supreme Court held that *Batson* should not be applied retroactively on collateral review of a conviction that became final before the *Batson* opinion was announced. The Court noted that most decisions announcing new constitutional rules are automatically nonretroactive where the decision overruled past precedent. *Id.* at 258, 106 S.Ct. at 2880. The decision in *Batson* was a clear break from the decision in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), the Court stated, and it proceeded to analyze the retroactivity question in light of three considerations. *Id.* All three considerations apply with equal force to any later Supreme Court decisions applying *Batson*'s principles to facts sufficiently different from those in *Batson* to constitute a new rule.

*Teague v. Lane* held with two narrow exceptions that a new constitutional rule of criminal procedure may not be applied retroactively on collateral review of a conviction that became final before the new rule was announced. See 489 U.S. at 310, 109 S.Ct. at 1075. Neither exception applies in this case. That decision leads to two conclusions concerning this appeal: (1) if white defendants have been accorded an equal protection right to challenge a prosecutor's use of peremptory strikes to exclude potential jurors of any race, because of their race, only on the basis of a post-*Batson* Supreme Court decision announced after the defendants' convictions became final, white defendants cannot rely on that rule in a habeas action; and (2) if granting white defendants standing to object to a prosecutor's use of peremptory challenges to exclude white prospective jurors from serving on the petit jury at the defendants' trial requires formulating a new rule that to date has not been authoritatively proclaimed, such defendants cannot rely on

that rule upon habeas review of their final convictions.

With regard to what constitutes a new rule, the Supreme Court wrote in *Teague v. Lane:*

> It is admittedly often difficult to determine when a case announces a new rule, and we do not attempt to define the spectrum of what may or may not constitute a new rule for retroactivity purposes. In general, however, a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government.... To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.

489 U.S. at 301, 109 S.Ct. at 1070 (emphasis in original) (citations omitted).

A case does not announce a new rule if it "was merely an application of the principle that governed" the Court's decision in an earlier case. *Id.* at 307, 109 S.Ct. at 1073 (quoting *Yates v. Aiken*, 484 U.S. 211, 216–17, 108 S.Ct. 534, 537–38, 98 L.Ed.2d 546 (1988)). On the other hand a decision does announce a new rule if the outcome of the later case "was susceptible to debate among reasonable minds...." *Butler v. McKellar*, 494 U.S. 407, 415, 110 S.Ct. 1212, 1217–18, 108 L.Ed.2d 347 (1990). This susceptibility may be evidenced by "differing positions taken by ... judges" on two courts of appeals. *Id.* Further, "the fact that a court says that its decision is within the 'logical compass' of an earlier decision, or indeed that it is 'controlled' by a prior decision, is not conclusive for purposes of deciding whether the current decision is a 'new rule' under *Teague*." *Id.*

### B.

We have the benefit of extensive arguments from all parties, in briefs and at oral argument, on the issues.

### (1)

The State contends that there is no authority for applying *Batson* to the scenario where a white defendant challenges the removal of white jurors. The State asserts the histori-

cal and fundamental purpose of *Batson* was to remedy traditional racial discrimination against blacks in the courtroom, and there is no evidence that white prospective jurors historically have been excluded from petit juries. The State cites other court of appeals decisions that have required either the defendant or the excluded juror to be a member of a minority race. See *United States v. Townsley*, 856 F.2d 1189, 1190 (8th Cir.1988), *cert. dismissed*, —— U.S. ——, 111 S.Ct. 1406, 113 L.Ed.2d 461 (1991); *United States v. Rodriguez*, 935 F.2d 194, 195 (11th Cir. 1991), *cert. denied sub nom.*, *Leon v. United States*, —— U.S. ——, 112 S.Ct. 911, 116 L.Ed.2d 811 (1992); *United States v. Nichols*, 937 F.2d 1257, 1262 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 989–90, 117 L.Ed.2d 151 (1992); *United States v. Ferguson*, 935 F.2d 862, 864 n. 1 (7th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 907, 116 L.Ed.2d 807 (1992). We are urged to not follow *Government of the Virgin Islands v. Forte*, 865 F.2d 59, 64 (3d Cir.1989), which the State contends held without analysis that *Batson* applied to both white and black defendants challenging jury exclusion of members of their own race.

Accordingly, the State maintains that an attempt to extend *Batson* to the instant case would constitute a new rule which under *Teague v. Lane* cannot be announced or applied in this collateral proceeding.

### (2)

The petitioners argue that the Fourteenth Amendment guarantees equal protection to black and white persons alike. They cite language in *Batson*, *Swain* and *Powers v. Ohio*, —— U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), which supports the position that in *Batson* the Court was concerned about all racial discrimination in jury selection, not just discrimination against minorities. They rely upon the fact that *Batson* framed the issue as the defendant's right to challenge the exclusion of "members of his own race." They also rely upon the decisions in *Forte* and in *Roman v. Abrams*, 822 F.2d 214, 227–28 (2d Cir.1987), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1311, 103 L.Ed.2d 580 (1989), to support the claim that *Batson's*

protections extend to white persons. They contend that the *Forte* court did analyze the *Batson* claim.

Finally, the petitioners deny that applying *Batson* to this case would constitute a new rule. They point out that the Court in *Powers*, —— U.S. at ——, 111 S.Ct. at 1369, made clear that discrimination in jury selection was both prohibited by federal criminal law, and by the Court's earlier decision in *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972). The Court of Appeals for the Second Circuit agreed in *Roman* when it held that white persons constitute a "cognizable racial group" for Sixth Amendment purposes. 822 F.2d at 227–28. Further, the petitioners emphasize the problems inherent in adopting a definition that includes only racial minorities in places like Detroit where white residents constitute only 37% of the population.

### III.

The Supreme Court has not addressed the issue of whether a prosecutor who strikes prospective white jurors from the venire because of their race at the criminal trial of a white defendant violates the Equal Protection Clause. Subsequent to *Batson*, however, the Court in *Powers* extended the *Batson* rule to hold that a prosecutor may not use peremptory challenges to exclude black prospective jurors from a white criminal defendant's jury on account of their race. Thus, white defendants are now accorded the same equal protection right as minority defendants to prevent the systematic exclusion of minority jurors. And just last term the Supreme Court held in *McCollum v. Georgia*, —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), that *Batson* prohibits a white criminal defendant from using peremptory strikes to exclude black members of the venire from the defendant's petit jury on account of their race. For the first time, the rule prohibiting the use of peremptory challenges for racial purposes was applied to defendants as well as to prosecutors.

### A.

*Batson* is universally recognized to have announced a new rule of constitutional law.

The present petitioners' convictions had not become final when *Batson* was announced; thus, there is no doubt that *Batson*'s holding would control their cases if they were black and the excluded jurors were black. The district court concluded further, however, that *Batson* answered the question raised by petitioners whether white defendants could challenge a prosecutor's peremptory strikes against white potential jurors. The court apparently reasoned that the *Batson* decision permitted a defendant to challenge the exclusion of potential jurors of his own race while *Powers* merely conferred third-party standing on defendants to raise the constitutional claims of jurors of races different from the defendants'. The district court, therefore held that the petitioners here had standing to raise their claims under *Batson* and declined to address whether *Powers* constituted a new rule.

We think the court erred in so holding because *Batson* does not inexorably lead to this conclusion. Just because *Batson* held that a black defendant could challenge the race-based exclusion of a black juror, if it was not fortuitous that the case involved a same-race defendant and juror, we think before *Powers* it was at least "susceptible to debate" that *Batson* announced a general rule about standing for same-race defendants and jurors. We instead read the non-debatable holding of *Batson* to be that black defendants have standing to challenge a state prosecutor's exclusion of black jurors on account of their race under the Equal Protection Clause. Thus, we hold that *Batson* did not decide the question of a white defendant's standing to raise the equal protection claims of excluded white venirepersons, and we do not believe that *Batson* itself can be applied to the petitioners' situation without announcing a new rule.

Therefore, we must look to other law to support the petitioners' claim of standing. Although the petitioners are entitled to the retroactive application of *Batson*, because we believe that *Batson* standing alone does not control, we examine the post-*Batson* decisions in light of the fact that petitioners' convictions had become final before *Powers* and *McCollum* were decided. If either of those decisions announced a new rule, the petitioners would not be able to rely on that rule in their collateral attack on the convictions. *Teague*, 489 U.S. at 310, 109 S.Ct. at 1075. Similarly, if the basis upon which the petitioners sought relief—that in a white defendant's trial a prosecutor's racially-motivated exclusion by peremptory challenges of prospective white jurors violated the Equal Protection Clause—itself required adoption of yet another new rule, granting habeas relief on such a basis would violate *Teague*'s limitation on retroactivity.

**B.**

The holding in *McCollum* provides no support for the petitioners; thus, it is not necessary to decide whether *McCollum* announced a new rule.

The facts of this case and the petitioners' arguments raise two distinct questions: first, whether the *Powers* holding that a white defendant may challenge the exclusion of prospective jurors on the basis of their race was dictated by *Batson*, or was a new rule; and, second, whether assuming *Powers* did not announce a new rule, application of *Powers* to permit challenges to the exclusion of *white* jurors would in itself announce a new rule. Although *Powers* permitted a white defendant to challenge a prosecutor's systematic exclusion of prospective jurors of a different race, and although *Batson* permitted a same-race challenge by a black defendant, no Supreme Court decision has permitted a white defendant to challenge the systematic exclusion of white prospective jurors.

In *Powers* the Court stated:

For over a century, this Court has been unyielding in its position that a defendant is denied equal protection of the laws when tried before a jury from which members of his or her race have been excluded by the State's purposeful conduct.... Although a defendant has no right to a 'petit jury composed in whole or in part of persons of [the defendant's] own race,' ... he or she does have the right to be tried by a jury whose members are selected by nondiscriminatory criteria. [citation omitted].

—— U.S. at ——, 111 S.Ct. at 1367. See also *id.* —— U.S. at ——, 111 S.Ct. at 1370.

We agree with the Court of Appeals for the Seventh Circuit that *Powers* announced a new rule insofar as it extended *Batson* to cover challenges by a white defendant to the prosecutor's exclusion of black jurors. *Holland v. McGinnis*, 963 F.2d 1044, 1053–55 (7th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1053, 122 L.Ed.2d 360 (1993). That is not this case, because the challenged jurors here were white. But *Powers* broke new *Batson* ground in two respects: (1) it permitted a defendant of one race to challenge a prosecutor's race-driven peremptory strikes of jurors of a different race; and (2) it permitted non-minority defendants to challenge race-driven peremptory strikes. The first new application of the *Batson* principle does not concern us, but, because these petitioners are white we must decide whether the second departure in *Powers* constituted a new rule.

*Batson* and *Powers*, in combination, provide ample support for extending the prohibition against racial discrimination in the use of peremptory challenges to a case where a prosecutor seeks to exclude prospective jurors of any race from the trial of white defendants because of the jurors' race. Although *Batson* involved a black defendant and black jurors, only after *Powers* was it clear that a white defendant possesses an equal protection right to challenge a prosecutor's racially discriminatory strikes. Adding this newly announced right to *Batson*'s emphasis on a defendant's right to prevent exclusion of jurors of the defendant's own race leads to this conclusion. We cannot conclude, however, that a white defendant's right to challenge racially-motivated peremptory strikes was established before *Powers*. The question remains whether this means that *Powers* announced a new rule.

The *Powers* Court made it clear, for the first time we believe, that the race of both the defendant and of the excluded juror are irrelevant to an equal protection analysis. The Court said: "We conclude that a defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race." The Court did not limit this holding to defendants challenging the exclusion of black or minority jurors.

*Powers* also rendered meaningless *Batson*'s first requirement for a prima facie case of discrimination—that the defendant show that he is a member of a "cognizable racial group." If a member of the majority race can be considered "a member of a racial group capable of being singled out for differential treatment," the first requirement is automatically met by every defendant who objects to a prosecutor's use of race-based peremptory challenges.

It seems beyond dispute that *Powers* is within "the logical compass" of *Batson* and even that it is "controlled" by it in the sense that without *Batson* there would have been no basis for permitting a defendant to challenge the prosecutor's use of peremptory strikes to exclude members of the defendant's race from the petit jury at his criminal trial. The question is whether the *Powers* result was *dictated* by *Batson*.

### IV.

#### A.

Other than *Batson*'s clearly stated purpose to provide a remedy for the historical exclusion of minorities from petit juries and frequent references to the fact that the defendant was black, the strongest evidence that *Powers* announced a new rule regarding white defendants is that at least four circuit courts of appeals were unable to anticipate *Powers* even though they applied *Batson* to black defendants. These courts all interpreted *Batson* to conclude that non-black defendants challenging the exclusion of black members from a jury lacked standing to bring such an Equal Protection claim. See *Townsley*, 856 F.2d at 1191; *United States v. Angiulo*, 847 F.2d 956, 984 (1st Cir.), *cert. denied*, 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988); *United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir.), *cert. denied*, 484 U.S. 928, 108 S.Ct. 295, 98 L.Ed.2d 255 (1987); *United States v. Rodriguez*, 917 F.2d 1286, 1288 (11th Cir.1990), *vacated and remanded*, 935 F.2d 194 (11th Cir.1991), *cert.*

*denied*, —— U.S. ——, 112 S.Ct. 911, 116 L.Ed.2d 811 (1992).

On the other hand, in the pre-*Powers* period one court read *Batson* as permitting an equal protection claim by both white and black persons, thus supporting the argument that *Powers* did not announce a new rule regarding either the race of the defendant or the race of the juror. In *Forte*, a white defendant on trial while *Batson* was pending in the U.S. Supreme Court urged his attorney, (on advice from another attorney) to object to the prosecutor's exclusion of white jurors on the basis of race. The attorney refused to object, and the court of appeals held in a 28 U.S.C. § 2255 proceeding that the refusal constituted ineffective assistance of counsel. In reaching the conclusion that the attorney acted "unreasonably" in refusing to object, the court stated, "Thus we now hold ... that *Batson* applies to both whites and blacks." *Id.* at 64. In addition, the court in *Roman*, a case where a white defendant challenged the exclusion of white jurors, relied on *Batson* to hold that for purposes of the Sixth Amendment requirement that a jury represent a fair cross-section of the community, white persons constitute "a cognizable or distinct group." *Id.* at 227–28.

### B.

■ As the Supreme Court stated in *Teague*, "[i]t is admittedly often difficult to determine when a case announces a new rule...." 489 U.S. at 301, 109 S.Ct. at 1070. This case is certainly no exception. Following *Teague*'s guidelines, however, we conclude that *Batson* did not dictate the district court's holding that any defendant, white or minority, can raise an equal protection challenge to a prosecutor's use of peremptory strikes for the purpose of excluding prospective jurors of the defendant's race from being seated. Further, while we believe that extending standing to defendants who challenge the race-based exclusion of jurors of any race is required by *Powers*, we do not think *Batson* dictated the *Powers* holding that a white defendant has standing to challenge a prosecutor's use of peremptory strikes for the purpose of excluding prospective jurors from being seated based on their race. Thus, *Powers* announced a new rule extending *Batson* rights to white defendants.

We are not persuaded by *Forte* and *Roman*, particularly in light of the decisions of four other courts of appeals that reached a contrary conclusion. The question of whether the outcome depended upon application of a new rule was not the central issue in either case. In addition to the fact that four courts of appeals found no basis before *Powers* for a white defendant to make an equal protection challenge because of a prosecutor's race-driven exclusion of potential jurors, we note that two members of the Supreme Court found that *Powers* "contradicts well established law in the area of equal protection and of standing...." —— U.S. at ——, 111 S.Ct. at 1374 (Scalia, J., joined by Rehnquist, C.J., dissenting).

### C.

This case provides a striking illustration of the logic and necessity of the *Teague* holding that habeas relief may not be based on a "new rule" not in existence when the underlying conviction became final.

Once the district court found, contrary to the Michigan courts, that the petitioners had made out a prima facie case, the prosecutor was faced with the formidable, if not impossible task, of providing a satisfactory explanation for nineteen peremptory jury challenges exercised at a trial that took place more than ten years earlier.

### V.

Because of these conclusions on the "new rule" issue, we do not reach the parties' remaining arguments, which are addressed to the district court's decision on the merits.

The judgment of the district court is reversed and the case is remanded with directions to dismiss the petitions.

RYAN, Circuit Judge, dissenting.

Three defendants are charged with attempting to murder a member of another race. The jury venire consists, by a large majority, of members of the victim's race. The defendants contend that the prosecutor,

in exercising his peremptory challenges, has struck a disproportionate number of jurors who share the defendants' race. Have the defendants articulated a *Batson* challenge? The majority says no.

Although conceding that "there is no doubt that *Batson*'s holding would control [the defendants'] cases if they were black and the excluded jurors were black," majority op. at 1349, the majority concludes that because the defendants and the stricken jurors are white, they necessarily fall outside the purview of the constitutional protections enunciated by the Supreme Court in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). According to the majority, it was not until *Powers v. Ohio,* —— U.S. ——, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), that the Supreme Court made "clear that a white defendant possesses an equal protection right to challenge a prosecutor's racially discriminatory strikes." Majority op. at 1350. Thus, according to the majority, "*Powers* announced a new rule extending *Batson* rights to white defendants," majority op. at 1351, and because a new rule may not be applied retroactively in a habeas corpus case, the defendants would not be entitled to relief even were they able to demonstrate that the prosecutor exercised his peremptory challenges in a racially discriminatory manner. Like the district court, however, I believe "that the *Batson* decision permitted a defendant to challenge the exclusion of potential jurors of his own race while *Powers* merely conferred third-party standing on defendants to raise the constitutional claims of jurors of races different from the defendants'," majority op. at 1349, and that the defendants therefore had standing to raise their claims under *Batson.* I therefore dissent.

## I.

The majority characterizes *Powers* as having "rendered meaningless *Batson*'s first requirement for a prima facie case of discrimination—that the defendant show that he is a member of a 'cognizable racial group.'" Majority op. at 1350. According to the majority,

"[i]f a member of the majority race can be considered 'a member of a racial group capable of being singled out for differential treatment,' the first requirement is automatically met by every defendant who objects to a prosecutor's use of race-based peremptory challenges." Majority op. at 1350. These statements reflect a dramatic misinterpretation both of *Powers* and of *Batson*'s concept of a cognizable racial group.

In *Batson,* the Supreme Court held that "the Constitution prohibits all forms of purposeful racial discrimination in selection of jurors," *Batson,* 476 U.S. at 88, 106 S.Ct. at 1718, and that "the State's privilege to strike individual jurors through peremptory challenges[ ] is subject to the commands of the Equal Protection Clause." *Id.* at 89, 106 S.Ct. at 1719. To establish a violation of the equal protection clause, "the defendant first must show that he is a member of a cognizable racial group, . . . and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race." *Id.* at 96, 106 S.Ct. at 1723 (citation omitted). In *Powers,* on the other hand, the Court held that a defendant need *not* be a member of the excluded group in order to challenge racially discriminatory peremptory challenges, because the defendant could utilize the doctrine of third-party standing in order to champion the equal protection rights of the excluded jurors. *Powers,* —— U.S. at ——, 111 S.Ct. at 1373.

Thus, when a defendant is a member of the same racial group as the excluded jurors, he may raise a first-party *Batson* claim;[1] when he is of a different racial group, he may raise a third-party *Powers* claim. In a case of first-party standing, the defendant essentially says, "I am a member of a certain racial group, and the prosecutor is discriminating against me by striking other members of that group from the jury out of a supposition that their membership in that group will disable them from serving as impartial jurors—that our common group membership will make

---

1. Although the Court in *Batson* acknowledged the deprivation of equal protection rights suffered by excluded jurors, and thereby tacitly admitted the possibility of third-party standing, 476 U.S. at 86–88, 106 S.Ct. at 1717–18, it did not explicitly decide the issue until *Powers.*

them automatically biased in my favor." [2]  In a case of third-party standing, a defendant says, "The prosecutor is violating the rights of certain jurors by striking them from the jury out of a supposition that their race makes them incapable of being impartial jurors, and in so doing is harming the jurors by foreclosing an important opportunity to participate in civic life, and is casting doubt on the fairness of the criminal proceeding." [3]

It is readily apparent that the defendants here are raising the first type of claim. It would only be necessary to look to *Powers* if the defendants were a) not members of a cognizable racial group, or b) not members of the same racial group as the excluded jurors. The latter is obviously not at issue here, and therefore the only question is whether whites constitute a cognizable racial group. Concluding that they do, I find it unnecessary to analyze *Powers* for whether it in fact stated a new rule. I view the majority's conclusions regarding *Powers* as nondispositive of this case.

## II.

The majority appears to believe that the phrase "cognizable racial group" imports a *minority* racial group. The basis for such a conclusion escapes me. "Cognizable," according to THE RANDOM HOUSE DICTIONARY OF THE ENGLISH LANGUAGE (Unabridged ed. 1981), means "capable of being perceived or known." We can readily identify an individual as "white"; we recognize that individuals in our society unfortunately persist in making race-based judgments on grounds, inter alia, of black and white; and here, we are confronted with a case in which three white men were accused of attempting to murder a black man apparently because of his relationship with a white woman. All these circumstances convincingly demonstrate the extent to which the category "white" denotes, in this society, a single racial unit—in other words, a cognizable racial group.

The *Batson* Court's use of the term is, moreover, consistent with this definition. *Batson* borrowed the phrase "cognizable racial group" from *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), a case treating purposeful discrimination in the selection of the jury venire. *Castaneda* used the term to refer to a defendant who could "show that he is a member of a racial group capable of being singled out for differential treatment." *Batson*, 476 U.S. at 94, 106 S.Ct. at 1722 (citing *Castaneda*, 430 U.S. at 494, 97 S.Ct. at 1280). This definition mandates that "cognizable racial group" be construed broadly

> to include any racial or ethnic group in which membership is readily apparent to prosecutors because of physical appearance, surname, or other factors.... This broad test reflects the concern articulated in *Batson* that the jury selection process permits "'those to discriminate who are of a mind to discriminate.'" 476 U.S. at 96, 106 S.Ct. at 1723 (quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953)). Obviously, this concern exists for any racial or ethnic group whose identity can be discerned by prosecutors either by means of physical appearance, such as blacks, whites, and Hispanics, or surname, such as Italian–Americans, Mexican–Americans, Polish–Americans, and Irish–Americans.

Brian J. Serr & Mark Maney, *Criminal Law: Racism, Peremptory Challenges, and the Democratic Jury: The Jurisprudence of a Delicate Balance*, 79 J.CRIM.L. & CRIMINOLOGY 1, 25, 25 n. 145 (1988).

---

**2.** This type of claim derives from *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1880), where the Court held that "the State denies a black defendant equal protection of the laws when it puts him on trial before a jury from which members of his race have been purposefully excluded." *Batson*, 476 U.S. at 85, 106 S.Ct. at 1716 (citing *Strauder*).

**3.** This type of claim derives from *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), where the Court held that "a 'State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause.'" *Batson*, 476 U.S. at 84, 106 S.Ct. at 1716 (quoting *Swain*, 380 U.S. at 203–04, 85 S.Ct. at 826–27). In *Powers*, the Court recognized implicitly the possibility that a prosecutor may wish to strike venirepersons for racially discriminatory strategic reasons unrelated to the assumption that jurors will show improper bias in favor of a defendant of their same race.

This broad understanding of "cognizable racial group" is, on the whole, consistent with the treatment of the term by courts. The Eighth and Tenth Circuits have held that Native Americans constitute a cognizable racial group for *Batson* purposes. *See, e.g., United States v. Bedonie*, 913 F.2d 782 (10th Cir.1990), *cert. denied,* ―― U.S. ――, 111 S.Ct. 2895, 115 L.Ed.2d 1059 (1991); *United States v. Roan Eagle*, 867 F.2d 436 (8th Cir.), *cert. denied,* 490 U.S. 1028, 109 S.Ct. 1764, 104 L.Ed.2d 199 (1989). The Second, Fifth, Ninth, and Tenth Circuits have all treated Hispanics as a cognizable group under *Batson. See United States v. Esparsen*, 930 F.2d 1461 (10th Cir.1991), *cert. denied,* ―― U.S. ――, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992); *United States v. Ruiz*, 894 F.2d 501 (2d Cir.1990); *United States v. Moreno*, 878 F.2d 817 (5th Cir.), *cert. denied,* 493 U.S. 979, 110 S.Ct. 508, 107 L.Ed.2d 510 (1989); *United States v. Chinchilla*, 874 F.2d 695 (9th Cir.1989). And when courts have determined that a defendant is *not* a member of a cognizable racial group, it has generally *not* been because he is not a member of a racial minority. Instead, the conclusion has been reached for more obvious reasons. Some of the categories that have been found not to constitute cognizable racial groups for *Batson* purposes are: women; black males, as opposed to blacks generally; and young adults. Nancy H. Reisman, *Right to Jury Trial*, 80 Geo.L.J. 1371, 1392–93 n. 1797 (1992).

Thus, if a defendant were an American of English descent, and asserted that other Americans of English descent were being stricken from the jury for that sole reason, he would not have standing to raise his claim under *Batson* because that group is not a "cognizable racial group." [4] Or if the defendant had an ancestor that was a member of some cognizable racial group—Native Americans, for example—yet the ancestor was so removed that no one could know of this lineage, then he would not have standing to raise a *Batson* claim for the exclusion of Native Americans from the jury.[5]

As the majority itself concedes, the cases in which courts have denied the *Batson* claims of white defendants have all been cases in which the white defendants tried to assert the equal protection claims of minority jurors. Those cases present the third-party claim made in the *Powers* case, not the first-party *Batson* claim presented here. The two courts that have had occasion to consider the type of situation presented here have both concluded that whites do constitute a cognizable racial group. *Government of Virgin Islands v. Forte*, 865 F.2d 59 (3d Cir.1989), presents a case in which a white defendant was accused of murdering a black man, in a jurisdiction where the population was predominantly black. On habeas review, the court rejected his claim, made under *Batson*, that the prosecutor had peremptorily challenged white venirepersons on a racially discriminatory basis—but only because of his failure to raise it to the state courts. The court explicitly acknowledged the legitimacy of his claim: "[W]e will not read *Batson* to make a distinction between white and black defendants. Defendants of both groups are entitled to trial before juries from which members of their race are not excluded as the result of purposeful discrimination by the prosecutor." *Forte*, 865 F.2d at 64. Likewise, the court in *Roman v. Abrams*, 822 F.2d 214 (2d Cir.1987), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1311, 103 L.Ed.2d 580 (1989), found it indisputable that whites constituted a cognizable racial group:

> The State's contention that White persons do not constitute a cognizable or distinctive group for Sixth Amendment pur-

---

**4.** This example demonstrates the fallacy in the majority's conclusion that if the majority race is a "cognizable racial group," then that requirement will be rendered meaningless because any defendant will be able to meet it. The majority fails to recognize that a defendant still must show that the excluded venirepersons are from the same group. Thus, a defendant of English descent who can make a prima facie showing only that venirepersons of English descent were excluded from the jury has not raised a *Batson*

challenge—even though he is white, and thus a member of a cognizable racial group. If he were able to show that whites generally were excluded from the jury, though, he *has* raised a *Batson* challenge.

**5.** He would, of course, still be able to assert a *Batson*-type challenge, by relying on the third-party standing described in *Powers.*

poses need not detain us long. Although the Supreme Court has declined to explore precisely the contours of cognizability, ... it has made it clear that "the concept of 'distinctiveness' must be linked to the purposes of the fair cross-section requirement[.]"

. . . .

It is plain that the exclusion of entire racial groups from jury service for reasons wholly unrelated to the ability of the individuals to serve as jurors in a particular case is squarely within the[ ] parameters [of the purposes of the fair cross-section requirement].

*Id.* at 227–28 (citations omitted). Although *Roman* analyzed the propriety of the prosecutor's peremptory challenges under the Sixth Amendment, rather than the equal protection clause, its understanding of "cognizable racial group" is relevant here because the underlying purposes of the Sixth Amendment's fair cross-section requirement and of *Batson*'s requirements are the same. *Compare Batson,* 476 U.S. at 86–88, 106 S.Ct. at 1217–18 *and Taylor v. Louisiana,* 419 U.S. 522, 530–31, 95 S.Ct. 692, 697–98, 42 L.Ed.2d 690 (1975).

## III.

The majority opinion refers to the historical discrimination against blacks in jury selection, and appears to suggest that because whites lack such a history, they are not entitled to *Batson*'s equal protection mandate. Such a notion should be rejected as without basis in law or reason. The *Forte* court recognized that it would be improper to "hold that a white defendant convicted by a jury selected in a racially discriminatory manner should be satisfied with the knowledge that it is usually blacks who are unfairly treated and therefore may be denied relief himself." *Forte,* 865 F.2d at 64. And the *Roman* court noted that

the exclusion of groups normally in the majority is no less objectionable for it arbitrarily deprives that group of a share of the responsibility for the administration of justice, deprives the defendant of the possibility that his petit jury will reflect a fair cross section of the community, and gives every appearance of unfairness.

*Roman,* 822 F.2d at 228.

Classification on the basis of race is simply not, as a general rule, unconstitutional only because of the historical fact of discrimination against a particular group. It is constitutionally suspect because classification on the basis of race can, in most circumstances, serve no legitimate purpose: "[R]ace, alienage, or national origin [are] factors [that] are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy...." *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Thus, that some groups have historically borne the brunt of racial discrimination does not eliminate the irrationality and unconstitutionality of discriminating against other groups.

## IV.

In addition to its use of history to bolster its reasoning, the majority alludes to *Batson*'s multiple race-specific references to the black defendant and the black excluded jurors, intimating that this demonstrates the Supreme Court's intention that the holding be likewise race-specific. Yet there is nothing in *Batson* to indicate that the Court did not intend to include whites within the ambit of its rule; specific references to blacks were obviously made because in *Batson,* the defendant and the stricken venirepersons were black—not because the holding was meant to apply only to blacks. Moreover, multiple race-neutral references to the prohibition of discrimination on the basis of *race,* as opposed to discrimination against one particular race, more than clarify the rule's intended general application. And for this court to indicate that racial discrimination is less harmful or is more legitimate when directed against one race as opposed to another is for it to indicate something heretofore absent from the law of equal protection. The operation of "the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification." *City of Richmond v. J.A. Croson Co.,* 488

U.S. 469, 494, 109 S.Ct. 706, 722, 102 L.Ed.2d 854 (1989). As one court has noted,·

[t]he Constitution is both color blind and color conscious. To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense, the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetuated and to undo the effects of past discrimination. The criterion is the relevancy of color to a legitimate governmental purpose.

*United States v. Jefferson County Bd. of Educ.*, 372 F.2d 836, 876 (5th Cir.1966), *cert. denied*, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103 (1967).

In the context of jury selection, as the *Batson* Court recognized, "[a] person's race simply 'is unrelated to his fitness as a juror.'" *Batson*, 476 U.S. at 87, 106 S.Ct. at 1718 (citation omitted). Accordingly, in this context, the Constitution's equal protection clause must be applied in a color-blind manner. This case simply does not present the difficult questions raised by the situations in which a court should arguably be color-conscious, such as judicial consideration of affirmative action programs and concomitant claims of reverse discrimination. Rather, the allegations made by the defendants present a straightforward case of invidious discrimination, in which a state actor is alleged to have made decisions impermissibly grounded in sweeping assumptions about how members of a particular race will behave, as a group. If the prosecutor made peremptory strikes for the reason the defendants claim he did, then he did so because he thought whites would be incapable, or at least less capable than other racial groups, of convicting white men accused of harming a black man. The defendants' allegations present the paradigmatic *Batson* claim, in which a defendant alleges that race was used as "a proxy for determining juror bias or competence." *Powers*, ——

U.S. at ——, 111 S.Ct. at 1370. There is no need for application of a new rule.

### V.

In Detroit, a majority of the population is black, and a minority is white—an unusual circumstance in this country. Here, as in *Batson*, three defendants claim to have suffered from a prosecutor's racially discriminatory strikes against minority venirepersons— but here, the minority happened to be white. Although the reversed racial roles in this case starkly highlight the extent to which this case requires a straight application of the rule in *Batson*, I do not mean to imply that *Batson* challenges should be limited to situations in which the defendant and the struck jurors are of a race that is a minority in the relevant jurisdiction. The rationale underlying the *Batson* decision requires

that no juror, regardless of race, should be removed simply because he happens to share the same race as the defendant. Exclusion of a potential juror simply because he is white is no less racial discrimination than exclusion of a juror simply because he is black.... It is difficult to see any distinction in terms of degrees of harm to defendant, jurors, or the community if the racial roles are reversed ... or if the group discriminated against happens to hold a majority position in the community.

Serr & Maney, *supra*, at 24–25, 25 n. 140.[6]

In sum, it is manifest to me that *Batson* does, contrary to the majority's assertion, lead inexorably to the conclusion that white defendants suffer an equal protection violation when a prosecutor strikes white venirepersons for racially discriminatory reasons. The majority's holding that *Batson* stands only for the proposition "that *black* defendants have standing to challenge a state prosecutor's exclusion of *black* jurors on account of their race under the Equal Protection Clause," majority op. at 1349 (emphasis

---

**6.** I recognize, however, that as a matter of practicality, it is generally only when jurors and defendants are of a minority race that prosecutors will be tempted to discriminate in the manner proscribed by *Batson*. As a general rule, utilizing this type of tactic against white venirepersons would simply not be at issue in the majority of jurisdictions, where the majority race is white, because it would be futile—a prosecutor would rapidly exhaust his peremptory challenges, only to be faced with a venire that was still largely white.

added), represents a departure from what has consistently been understood to be the requirement of the Constitution. Apparently, the majority does not even view *Batson* as applying only to minority defendants; under the majority's reasoning, after *Powers* and *Batson*, it would constitute creation of a new rule to prohibit racially discriminatory challenges in the case of, for example, an Asian–American defendant. Requiring each "cognizable racial group" to get a representative defendant in front of the Supreme Court in order to be entitled to basic tenets of the equal protection clause is without precedent in our country's constitutional doctrine.

## VI.

In light of my strong fundamental disagreement with the majority opinion's reasoning, I must dissent. Despite considerable reluctance, I feel compelled to conclude that the issuance of the writ of habeas corpus should be affirmed. First, our standard of review of the district court's findings of fact is limited to review for clear error. *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir.1988), *cert. denied*, 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989). Second, the state trial court here made imprecise and unfocused findings of fact that were wholly inadequate to protect the record before it. In so doing, the state court virtually invited the federal court to conduct the thorough and painstaking inquiry that it did, and created a situation where it was necessary for the federal court to make its own highly detailed findings of fact.

In short, the district court did what the Recorder's Court should have done, by providing a full and complete record and making critical findings of fact. In light of the state court's deficient performance, I am simply unable to say that the district court failed to accord sufficient deference to the state court's decision that the defendants had failed to make a prima facie case.

Therefore, I dissent.