RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0073p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 14-1499

NABILA MAHBUB,

*Defendant-Appellant.*

───────────────

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:10-cr-20014—Denise Page Hood, Chief District Judge.

Argued: June 9, 2015

Decided and Filed: March 29, 2016

Before: KEITH, CLAY, and STRANCH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Elizabeth L. Jacobs, Detroit, Michigan, for Appellant. Stephanie M. Gorgon, OFFICE OF THE UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee. **ON BRIEF:** Elizabeth L. Jacobs, Detroit, Michigan, for Appellant. Stephanie M. Gorgon, OFFICE OF THE UNITED STATES ATTORNEY'S OFFICE, Detroit, Michigan, for Appellee.

───────────────

## OPINION

───────────────

DAMON J. KEITH, Circuit Judge. A jury convicted Nabila Mahbub of conspiring to commit healthcare fraud under 18 U.S.C. § 1349. The district court sentenced Mahbub to a below-guidelines range sentence of forty-six months in prison. Mahbub timely appealed. On appeal, Mahbub contends the following: (1) the district court erred in denying Mahbub's

1

challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986); (2) the district court erred in using the Sixth Circuit pattern jury instruction regarding the criminal conspiracy claim; (3) Mahbub's trial counsel rendered ineffective assistance of counsel for failing to object to the jury instruction; and (4) Mahbub's sentence was substantively unreasonable.

Because the district court erred in denying Mahbub's *Batson* challenge, we **REMAND** the case to the district court for further proceedings, but **AFFIRM** the district court in all other respects.

## I.    FACTUAL BACKGROUND

At trial, the government's theory of the case, in relevant part, was as follows: All American Home Care, Inc. ("All American") was a health agency that purportedly provided a range of therapy-related services at the homes of patients.  R. 716 at 7314.  All American was a Medicare[1] provider that submitted claims directly to Medicare.  *Id.*  Mahbub was an office manager at All American, which meant that she would assist in managing the day-to-day operations at All American.  *Id.* at 7315, 7317.  All American submitted claims to Medicare for the cost of various therapy services that were medically unnecessary and not provided.  *Id.* at 7317.  According to the government, Mahbub specifically created, fabricated and falsified medical and billing documents.  *Id.* at 7318.  This was done to facilitate the commencement of home health services purportedly provided by therapy assistants working for All American.  *Id.* at 7318–19.  The parties stipulated that All American was paid $5,809,435.74 by Medicare for home-health services between September 2008 and November 2009.  R. 717 at 7606.

In 2012, Mahbub, along with other individuals, was indicted for her participation in this fraudulent scheme.  R. 451.  In 2013, a jury convicted Mahbub of conspiracy to commit healthcare fraud under 18 U.S.C. § 1349, R. 568, and Mahbub was sentenced to forty-six months in prison, R. 682.

---

[1]Medicare is "the federal health insurance program for people who are 65 or older, certain younger people with disabilities, and people with End-State Renal Disease (permanent kidney failure requiring dialysis or a transplant . . . ."  Medicare.gov, https://www.medicare.gov/glossary/m.html (last visited February 9, 2016).

The following facts are relevant to this appeal.

*a.* *Voir Dire.*

During *voir dire*,[2] the government asked Mr. Syed, a prospective juror, questions related to the responses he had provided in a questionnaire.[3] R. 716 at 7339. For example, the government asked Mr. Syed whether he had seen Southeast Asians[4] "charged [with committing crimes] in [certain] news stories." *Id.* at 7340.[5] The government also asked him whether he felt like the "South[]Asian" community was being "unfairly targeted." *Id.* The exchange continued as follows:

> THE GOVERNMENT: Do you feel like the Government has unfairly targeted the [S]outh[] Asian community in any way?
> MR. SYED: No. I feel like they did it, that's why.
> THE GOVERNMENT: So—
> MR. SYED: If they commit the fraud, so they were charged with it.
> THE GOVERNMENT: So you don't feel like it is unfair to focus on the—
> MR. SYED: I wouldn't say it is unfair. It's fair.

*Id.* at 7340–41.

Defense counsel then proceeded to ask Mr. Syed questions. Defense counsel asked Mr. Syed to explain what the *hijab* was. *Id.* at 7341. The *hijab*, Mr. Syed explained, is a headscarf that Muslim women don. *Id.* Defense counsel asked him whether the *hijab* made him feel a certain way. *Id.* at 7342. Mr. Syed replied:

---

[2]*Voir dire* is a "preliminary examination of a prospective juror by a judge or lawyer to decide whether the prospect is qualified and suitable to serve on a jury." Black's Law Dictionary (10th ed. 2014).

[3]The questionnaire had been prepared by defense counsel and the government and had been circulated to the prospective jurors for completion. *See* R. 716 at 7333.

[4]Although the government refers to the "Southeast Asian" community, it probably meant to use the term "South Asian." "South Asian" is a term used to describe inhabitants of countries that make up South Asia, including Pakistan and Bangladesh. *See* "South Asian, adj. and n.," *OED Online* (January 2016), http://www.oed.com/view/Entry/242301?redirectedFrom=south+asian#eid (last visited Jan. 26, 2016).

[5]An example of this news story, the government later explained, is a *Detroit Free Press* article dated November 28, 2011. R. 717 at 7520. In the response brief, the government provided the following citation for the article: "Judges saying 'no bond' to white-collar suspects," *Detroit Free Press*, Nov. 28, 2011, *available at* 2011 WLNR 24603864. Appellee Br. 23. The article described, in relevant part, the flight risk posed by a Pakistani businessman charged with "bilking" $31 million from Medicare.

Yes, in a good way, or I respect to her.  Like, I'm more—just because I'm from that culture and I myself as a Muslim and my sister also wears the *hijab* and she is just more respectful.

*Id.*

Later, defense counsel presented a factual scenario to the prospective jurors.  *Id.* at 7345–46.  In that scenario, defense counsel expressed his concern that his daughter might "end up working at a clinic, someplace where they don't do things right and she might get caught up in something that ends her up in a place like . . . where Ms. Mahbub is sitting."  *Id.*  While discussing the scenario, defense counsel noticed Mr. Syed shake his head in agreement.  *Id.* at 7346.  Defense counsel asked Mr. Syed whether he had the same concern for his children or his family.  *Id.*  Mr. Syed replied in the affirmative.  *Id.*  Defense counsel asked him to elaborate on his response, and Mr. Syed replied as follows:

A: I—as you said, do you want your daughter to work at a place where these kinds of things happen, and oh, there might be a reason that they—where I been there and were you aware of depending on the person and the position.

*Id.*

When defense counsel repeated the hypothetical question to the other prospective jurors, he noticed that another prospective juror shook her head.  *Id.*  That juror, Ms. Brown, expressed the following:

A: Yes.  I wouldn't want them to be in a position where they feel they can't, you know, get out of it if they find out there is something going on.  That it should be, you know, but because of authority over them or because they need the job or, you know, they feel they have to stay.

. . . .
A: Sometimes you feel like you don't have a voice.  You need the job.  You don't want to say anything because you don't want to lose the job or anything like that, so somebody—you know, you might go along with it or, you know, look past it or, you know, not speak up or anything.

*Id.* at 7347–48.

Later, the government asked Ms. Brown a follow-up question:

Q: Finally, I want to turn to Ms. Brown in seat 1. . . . I think you said that it became—that sometimes younger people get caught in sticky situations and don't know how to get out, am I characterizing it?

A: Not just younger people.

Q: But folks generally.

A: Yes.

Q: And does that make you want to give a pass to people in certain situations? Well, you might say, this is—well, they got caught up, or let's say it is the first time someone has done something wrong, are you willing to give them a pass, maybe they didn't know how to get out of it or are you going to go by weighing the evidence?

A: I have to weigh the evidence.

*Id.* at 7378–79.  The prosecutor did not ask Mr. Syed the same follow-up question.

i.      *Mahbub raises a* Batson *challenge.*

The government peremptorily challenged two jurors, one of whom was Mr. Syed.  A peremptory challenge is "[o]ne of a party's limited number of challenges that do not need to be supported by a reason unless the opposing party makes a prima facie showing that the challenge was used to discriminate on the basis of race, ethnicity, or sex."  Black's Law Dictionary (10th ed. 2014).[6]  Mahbub made a *Batson* challenge as to Mr. Syed, explaining "I believe there are only two that I can identify as potential Muslims" in the entire jury pool, "maybe only one, and [Mr. Syed] is one obviously."  R. 716 at 7399.  Specifically, "[t]o excuse the only Muslim on a panel, and only one of two, leaves . . . Mahbub facing a trial without having any juror of her peers here."  *Id.*  According to defense counsel, "excusing the only Muslim on the panel, possibly the only one in this array, is a matter to make sure that a Muslim doesn't get on the jury, which is improper under *Batson*."  *Id.* at 7400.

In response, the government indicated that there is "factually no basis that the [g]overnment is trying to eliminate all Muslim[s] or South Asians from the jury."  *Id.* at 7401.

---

[6]By contrast, a challenge for cause is one supported by "specified reason, such as bias or prejudice, that would disqualify that potential juror."  *Id.*

The government also interpreted Mahbub's challenge as one challenging the makeup of the jury pool, and indicated that the "jury pool is drawn from people registered in the state[,] and it is a randomly selected pool of people." *Id.* at 7400. Thus, according to the government, "there is [no] basis to conclude that somehow the pool was rigged." *Id.*

After hearing the government's explanation, the district court clarified that it expected the government to proffer a "non-discriminatory" explanation for excusing Mr. Syed. *Id.* at 7401. The government responded as follows:

> [T]he reason was that I felt uncomfortable with his answer to whether or not he would be able to—there is some discomfort if someone was younger whether or not he would have difficulty seeing them, being able to fairly evaluate them. And also, he indicated that, and I think along the lines of the question I asked Ms. Brown as well as the fact that . . . sometimes people get in situations they can't get themselves out of . . . and . . . he viewed sometimes defendants in those situations through the person and family members[,] and he expressed some discomfort with respect to the notion of judging it. That was the basis.

*Id.* at 7401–02.

Defense counsel responded that the government's reason was "disingenuous" because Mr. Syed indicated in his questionnaire that "if a younger person defrauded Medicare no matter what age that the person is, they should be punished." *Id.* at 7402. Defense counsel then conceded that a "recent Sixth Circuit case that upheld the jury wheel in the Eastern District [of Michigan]" foreclosed him from challenging the jury pool. *Id.* at 7403. Even so, defense counsel further pressed that such a random draw "cannot accurately reflect the ethnic makeup of the population . . . ." *Id.*

Before ruling, the district court summarized the government's reasons for excusing Mr. Syed was his apparent "discomfort with the answer to the question about a younger person and a person not being able to get out of the situation they're in." *Id.* at 7404. The government confirmed that the district court's articulation of the reasons was correct. *Id.* The court then took a ten-minute recess. *Id.*

>    ii.     *District court ruling on* Batson *challenge.*

After recess, the district court first asked defense counsel whether the government asked any questions of Mr. Syed related to his religious or ethnic background. *Id.* Once defense counsel indicated that he did not think the government posed any such question, the court announced that it was ready to rule on the *Batson* challenge. *Id.* at 7405. The district court stated that the elements of the prima facie *Batson* case were:

>    One, their membership in a recognized and cognizable race or religious group.
>
>    Two, that the members of the person's race or religion have been removed from the venire via peremptory challenged by the other party.
>
>    And three, that the underlying facts and relevant circumstances indicate that the other party employed a method . . . to exclude veniremen from the petit jury on account of their race, because in *Batson* it was a challenge to race.

*Id.* at 7405–06. The district court listed three ways of proving an inference of discrimination. *Id.* First, there might be a "pattern of discrimination against [minority] jurors in a specific venire;" second, "an inference may be found in questions and attempts made during *voir dire* proceedings;" third, the challenger might show that the party making the peremptory strike made statements or asked questions or otherwise made attempts that support an inference of discrimination during the "exercise of the peremptory challenge." *Id.* at 7406–07.

The district court indicated that Mahbub had not shown that any of these methods applied here. *Id.* at 7406–07. It ruled on the first two elements. It indicated that it did not think that Mahbub had met her burden that she was a "member of racial or religious group;" further, "there hasn't been any showing that other members [of a racial or religious group] have been removed . . . ." *Id.* at 7407. The district court also noted that it did not think that the government "asked any questions relative to Mr. Syed's ethnic background or his race or religious background." *Id.*; *see id.* at 7406 ("I actually think all of the questions posed about anything related to religion or ethnic background or their coming from that region of South Asian descent are all questions that have been raised by the Defense . . . .").

The district court then noted that "if . . . a prima facie case had been made, the burden would shift back to the opposing party to provide a neutral explanation for challenging . . . the

jurors." *Id.* at 7408. The court also found that the government's reasons were "neutral." *Id.*
Further, the district court explained:

> [The government] said [Mr. Syed] answered the younger person question with
> some hesitation, that he could see that there was some hesitation, that he could see
> that there was some discomfort in the person being in a situation where they did
> not expect to be in, and while I don't think that his answers were—well, they
> certainly weren't strong enough to raise to the level of a challenge for cause, and
> while I don't specifically remember them being specifically any stronger, I
> believe, than some of the other jurors that are sitting here, they certainly arise
> from the racial and religious, not racial, as well. And while I don't think they're
> such great reasons for exercising your peremptory challenges, I don't think that
> we probably even necessarily get that far because I don't think you have made out
> the prima facie case.

*Id.* at 7408–09.

After the ruling, the parties engaged in an extensive colloquy with the court about the use
of questionnaires. *Id.* at 7409–15. Defense counsel explained that the government did not need
to ask any questions about race or ethnicity because such information could be gleaned from the
questionnaires themselves. *Id.* at 7410. The district court, after reviewing Mr. Syed's responses
to the questionnaire, responded that it could not "see how [Mahbub] can hold the [g]overnment
accountable for that if [the parties] agreed to the questions."[7] *Id.* at 7413. The court suggested
that the government may have had an additional reason for exercising its peremptory strike: "It is
of interest to me that the [g]overnment in their response didn't say that we know this person is
seeing a physical therapist, they already have a strong feeling about fraud, it might taint them, it
is not followed up at all by the [g]overnment." *Id.* at 7414. In any case, the district court
concluded, Mahbub had not made a prima facie case. *Id.* at 7415.

### b. Trial proceedings.

The next day, outside the presence of the jury, the government sought to clarify the
record regarding the *Batson* challenge. R. 717 at 7519. The government wanted to note for the
record that it asked Mr. Syed a question related to his nationality. *Id.* The question had asked

---

[7]In his questionnaire, Mr. Syed indicated, among other things, that: he is Pakistani; he has friends who are
physical therapists; he thinks people who defraud Medicare should be punished; and he has been seeing a physical
therapist because of a back injury. *See* R. 746.

was whether Mr. Syed felt that the government was "improperly targeting any communities." *Id.* The government referred to a November 28, 2011 *Detroit Free Press* article about whether the government was "unfairly targeting foreigners." *Id.* at 7520. According to the government, because Mr. Syed indicated that he followed stories in the news about South Asians charged with committing crimes, *see* R.716 at 7340, it was an appropriate question to ask, R. 717 at 7519–20.

Defense counsel indicated that the government's response "fortified the need to renew [Mahbub's] *Batson* challenge." *Id.* at 7520. Like the government, defense counsel also took the opportunity to clarify the record. *Id.* at 7521–22. He indicated that the other juror who he thought was Muslim was not; she was Indian. *Id.* Defense counsel had peremptorily stricken her from the jury pool. *See* R. 716 at 7418, 7466. The court responded that the two categories— Indian and Muslim—were not mutually exclusive.[8] R. 717 at 7522.

Trial took place over five days.[9] Appellee Br. 13. On April 17, 2013, the jury convicted Mahbub of conspiring to commit healthcare fraud under 18 U.S.C. § 1349. R. 568. On April 16, 2014, a judgment was entered against Mahbub. R. 682. She timely appealed. R. 683.

## II. DISCUSSION

### A. *Batson* challenge

Mahbub contends that she presented a prima facie case of purposeful discrimination during her *Batson* challenge. Appellant Br. 28. In support of this argument, Mahbub argues that Mr. Syed and Ms. Brown were similarly situated—here, that means both initially responded similarly to the scenario about younger people finding themselves in difficult situations. *Id.*

---

[8]The court tried to clarify whether Mahbub's *Batson* challenge was based on "religion and area of nationality or area of the world." R. 717 at 7523. Although defense counsel referred to Mr. Syed's nationality, he still implied that the challenge was based on religion: "I believe the juror who was excused said he was from Pakistan. Pakistan is known to be a Muslim country. Based on the way he answered the questions, he is obviously of the Muslim religion, as is Ms. Mahbub." *Id.*

[9]On the last day of trial testimony, the government again raised the *Batson* challenge before the court, *see* R. 708 at 7024–26, to make sure the court had ruled on what the government viewed as a renewed *Batson* challenge. Although the district court indicated that it would "close the loop but not the section"—and it is not clear what "section" refers to—it later stated emphatically that it "closed the loop." *Id.*

However, the government excused Mr. Syed for providing the same response as Ms. Brown did.[10] *Id.*

### 1.     Standard of review.

"We review a district court's determination of a *Batson* challenge with 'great deference,' under a clearly erroneous standard." *United States v. Cecil*, 615 F.3d 678, 685 (6th Cir. 2010), *cert. denied*, 562 U.S. 1240 (2011); *see also Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003). Nevertheless, "deference does not imply abandonment or abdication of judicial review." *Cockrell*, 537 U.S. at 340. When ruling on "alleged mistake[s] of law, it makes no difference whether we review this *Batson* challenge for clear error . . . or review it de novo. In either event, a mistake of law generally satisfies clear-error, de-novo or for that matter abuse-of-discretion review." *United States v. Kimbrel*, 532 F.3d 461, 465–66 (6th Cir. 2008); *see also Cecil*, 615 F.3d at 685 ("[W]hen ruling on alleged mistakes of law, the applicable standard of review is essentially *de novo*.").

None of the *Batson*-arguments Mahbub raises on appeal were presented to the district court, and all are thus unpreserved. *See, e.g., United States v. Crawford*, 60 F. App'x 520, 535 (6th Cir. 2003) (stating that an issue not raised below is not preserved for appeal). In the context of these unpreserved arguments, we apply the plain-error standard of review. Fed. R. Crim. P. 52(b) ("A plain error that affects substantial rights may be considered even though it was not brought to the court's attention."). Ordinarily, for an error to be "plain":

> (1) there must be a legal error . . . ; (2) the error must be clear; (3) the error must
> have affected the appellant's substantial rights in that it affected the outcome of
> the district court proceedings; and (4) the error must have seriously affected the
> fairness, integrity, or public reputation of the judicial proceedings.

*See United States v. Lawrence*, 735 F.3d 385, 401 (6th Cir. 2013). Additionally, we have held that a district court's improper denial of a *Batson* challenge constitutes a "structural error." *See, e.g., United States v. McAllister*, 693 F.3d 572, 582 n.5 (6th Cir. 2012). "Structural errors" are errors that affect the "entire conduct of the trial from beginning to end." *Arizona v. Fulminante,*

---

[10]Although the record does not indicate Ms. Brown's race, her race is presumably different from Mr. Syed's based on the context of the colloquies in the district court.

499 U.S. 279, 309 (1991). Structural errors are a "very limited class of errors that trigger automatic reversal because they undermine the fairness of a criminal proceeding as whole." *United States v. Davila*, 133 S. Ct. 2139, 2149 (2013) (internal quotation marks omitted)). Accordingly, a defendant making a *Batson* challenge need not make a separate showing that the third and fourth elements of the plain error review have been met.[11] *McAllister*, 693 F.3d at 582 n.5. All the defendant must show is that the first two elements have been met—i.e., that the district court made an (1) error that was (2) clear. *Cf. United States v. Olano*, 507 U.S. 725, 734 (1993) ("At a minimum, court of appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law."); *United States v. Brown*, 352 F.3d 654, 664 (2d Cir. 2003) ("The most obvious example of plain error is a trial court decision in direct contravention of governing case law.").

### 2.    Burden-shifting framework under *Batson*

There are three steps to a *Batson* inquiry:

*Step one.* To prevail on a *Batson* claim, the defendant must first "make a prima facie showing of discriminatory use of peremptory challenges." *United States v. Harris*, 192 F.3d 580, 586 (6th Cir. 1999). Under *Batson*, a prima facie case is established by showing each of the following elements:

> [1] that [the defendant] is a member of a cognizable racial group . . .
>
> [2] that the prosecutor has exercised peremptory challenges to remove from the [jury pool] members of the defendant's race . . . [and]
>
> [3] that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the [potential jurors] from the petit jury on the account of their race.

*Batson*, 476 U.S. at 96. As explained in detail in the next section, the Supreme Court in *Powers v. Ohio*, 499 U.S. 400 (1991), "modified the *Batson* prima facie case to allow a defendant to raise

---

[11]We also note that while "[o]rdinarily Rule 52(b) is invoked by counsel[,] who, in preparing an appeal, discover what they consider to be error to which they took no objection below . . . the rule is not so limited." *United States v. Finch*, 998 F.2d 349, 354–55 (6th Cir. 1993) (quoting 3 Charles A. Wright, Federal Practice and Procedure, Criminal 2d § 856). An "appellate court may take notice of the error on its own motion though it was never put forward by counsel." *Id.* at 355.

a *Batson* violation even if he is not of the same race as the excluded juror." *United States v. Odeneal*, 517 F.3d 406, 419 (6th Cir. 2008).

In determining whether a prima facie case exists, the trial court "should consider all relevant circumstances." *Batson*, 476 U.S. at 96. "For example, a 'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." *Id.* at 97. "Similarly, the prosecutor's questions and statements during *voir dire* examination and in exercising his challenges may support or refute an inference of discriminatory purpose." *Id.* These examples, the *Batson* Court held, are "merely illustrative," and the Court reasoned that trial judges, "experienced in supervising *voir dire*, will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination against black jurors."[12] *Id.*

*Step two.* Once this showing is made, the government must offer a "race-neutral explanation for challenging the jurors." *Harris*, 192 F.3d at 586. This proffered reason "need not be particularly persuasive, or even plausible, so long as it is neutral." *Id.*; *see also Purkett v. Elem*, 514 U.S. 765, 767–68 (1995).

*Step three.* Once a race-neutral explanation is "tendered, the trial court must then decide . . . whether the [party raising the *Batson* challenge] has proved purposeful racial discrimination." *Odeneal*, 517 F.3d at 419 (quoting *Purkett*, 514 U.S. at 767). At this step, the trial court must assess the plausibility of the prosecution's proffered explanation "in light of all

---

[12]*Batson* has been expanded to cover other categories of potential jurors. "Under the Equal Protection Clause, a defendant may not exercise a peremptory challenge to remove a potential juror solely on the basis of the juror's gender, ethnic origin, or race." *United States v. Martinez-Salazar*, 528 U.S. 304, 315 (2000) (collecting cases).

At this point, we note that the parties and the district court used multiple terms to describe the categories of groups that purportedly fall within *Batson*'s reach—Muslims (R. 716 at 7399) and South Asians (R. 716 at 7406). The categorization of "South Asian" as a race or ethnicity is the subject of academic scholarship. *See, e.g.*, Vinay Harpalani, Ambiguity, Ambivalence, and Awakening: a South Asian becoming "critically" aware of race in America, 11 Berkeley J. Afr.-Am. L. & Pol'y 71 (2009); Charu A. Chandrasekhar, Note, Flying While Brown: Federal Civil Rights Remedies to Post 9/11 Airline Racial Profiling of South Asians, 10 Asian Law J. 215 (2003). Courts have not consistently referred to "South Asian" as either a race or an ethnicity. *See, e.g.*, *Nayyar v. Mount Carmel Health Sys.*, Nos. 2:12–CV–00189, 2:10–CV–00135, 2013 WL 2418072, at *4 n.4 (S.D. Ohio June 3, 2013) (referring to the plaintiff's race as South Asian); *Gazvoda v. Secretary of Homeland Security*, Case No. 15-cv-14099, 2015 WL 7450397, at *2 (E.D. Mich. Nov. 24, 2015) (referring to "South Asian ethnicity"). However, because *Batson* applies to both race and ethnicity, *Martinez-Salazar*, 528 U.S. at 315, we conclude that South Asians are protected for *Batson* purposes.

evidence with a bearing on it." *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005); *see also United States v. Torres-Ramos*, 536 F.3d 542, 560 (6th Cir. 2008) ("We believe that this command places an affirmative duty on the district court to examine relevant evidence."). "Notably, 'the ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from" the party raising the *Batson* challenge. *United States v. Mahan*, 190 F.3d 416, 424 (6th Cir. 1999) (quoting *Purkett*, 514 U.S. at 768).

Noticeably, *Batson* contains no discussion of religion as the district court erroneously suggested. As the government correctly points out, whether *Batson*'s reasoning extends to religion remains unclear. *See* Appellee Br. 17; *see also United States v. Stafford*, 136 F.3d 1109, 1114 (7th Cir. 1998) ("The constitutional status of peremptory challenges based on religion is unsettled. . . ."); *Davis v. Minnesota*, 511 U.S. 1115 (1994) (denial of certiorari in case raising the issue). Though the district court appeared to think that *Batson* extended to religion, *see, e.g.*, R. 716 at 7405, we take no position on the issue.

### 3.   Merits of Mahbub's prima facie challenge

The issue that we must resolve is whether the district court improperly denied Mahbub's prima facie challenge. In other words, we must determine whether the district court erred in concluding that Mahbub had not met her burden of showing that the government's peremptory strike of Mr. Syed from the jury raised an inference of purposeful discrimination.[13] Upon review

---

[13]In its brief, the government indicates that the district court completed all three steps of the *Batson* inquiry. Appellee Br. 25. ("The district court also arguably sufficiently addressed *Batson*'s third step when 'it rejected the *Batson* challenge after the government offered its race-neutral explanation and the defense counsel offered a brief rebuttal' before 'allowing the proceedings to continue.'") (quoting *United States v. Du*, 570 F. App'x 490, 497 (6th Cir. 2014)). According to the government, the relevant inquiry on appeal might be whether the district court clearly erred in ruling that there was no evidence of purposeful discrimination—and *not* whether there was any inference of purposeful discrimination to support a prima facie case.

However, it is clear that the district court never ruled on the ultimate question of discrimination. We faced the same set of circumstances in *United States v. Ervin*, 266 F. App'x 428 (6th Cir. 2008). In *Ervin*, the district court ruled that the defendant failed to make a prima facie showing, but still invited the prosecutor to provide a race-neutral explanation. *Id.* at 433. After the prosecutor provided one, the district court denied the challenge. *Id.* In arguing that the district court failed to complete all three *Batson* steps, the defendant relied on the Supreme Court's reasoning in *Hernandez v. New York*, 500 U.S. 352 (1991). *Id.* In that case, the Supreme Court held that once the prosecutor has offered a race-neutral explanation and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of intentional discrimination becomes moot. *Hernandez*, 500 U.S. at 359. But we concluded that *Hernandez* was inapplicable. *Ervin*, 266 F. App'x at 433. Whereas the prosecutor in *Hernandez* provided his explanation *without* any prima facie ruling from the trial court, the *Ervin* trial court had ruled on the

of the *voir dire* transcript and relevant case law, we conclude that the district court: (1) erred in requiring Mahbub to show that she was a member of cognizable racial group; and (2) failed to recognize that the government's use of "contrasting *voir dire* questions" could raise an inference of discrimination. *See Dretke*, 545 U.S. at 255; *Echlin v. LeCureux*, 995 F.2d 1344, 1350 (6th Cir. 1993). We address each of these errors in turn.

### i.　　First element of prima facie case.

The Supreme Court held in *Powers v. Ohio* that a white criminal defendant could challenge under *Batson* a prosecutor's race-based peremptory strike. 499 U.S. at 402. We later reasoned that "[i]f a member of the majority race can be considered a member of a racial group capable of being singled out for differential treatment"—as in *Powers*—"the first requirement is automatically met by every defendant who objects to a prosecutor's use of race-based peremptory challenges." *Echlin*, 995 F.2d at 1350 (internal quotation marks omitted). Put another way, *Powers* "rendered meaningless *Batson*'s first requirement for a prima facie case of discrimination." *Id*.

In denying Mahbub's *Batson* challenge, the district court concluded that Mahbub did not show that she was a member of a cognizable racial group. R. 716 at 7407. The district court was right. At no point before the district court's ruling did defense counsel ever show that Mahbub was a member of cognizable racial group. But this failure on Mahbub's part is of no legal consequence. *See Echlin*, 995 F.2d at 1350. Thus, the district court's reliance on Mahbub's failure to identify herself as a member of a cognizable racial group in denying the *Batson* challenge was a mistake of law, and so remand is proper. *Cecil*, 615 F.3d at 685. Though remand is proper on this ground, we nonetheless discuss the district court's rulings with respect to the other elements of the prima facie case.

### ii.　　Second element of prima facie case.

As explained above, the prospective juror need not be of the same race as the defendant. *Powers*, 499 U.S. at 402; *Echlin*, 995 F.2d at 1350. It is unclear whether the district court

---

prima facie challenge. *Id.* *Ervin*'s reading of *Hernandez* is persuasive, and so we similarly conclude that the main issue on appeal is whether the district court erred in denying Mahbub's *Batson* prima facie challenge.

believed that Mahbub and Mr. Syed had to be of the same race in order for Mahbub to prevail on her *Batson* challenge. R. 716 at 7407. For that reason, we take no position on whether the district court erred here, but we take this opportunity to clarify this element in order to avoid confusion on remand.

### iii. Third element of prima facie case.

The district court also erred when it addressed the third element of the prima facie case—namely, that the facts and relevant circumstances raise an inference that the juror was excluded on the basis of race. *See Batson*, 476 U.S. at 96. While discussing the prosecutor's use of *voir dire* questions, the district court indicated that the questions themselves needed to—on their face—relate to a juror's race to support an inference of discrimination. *See* R. 716 at 7407 ("I don't think Mr. Gobena asked any questions relative to Mr. Syed's ethnic background or his race or religious background."); *id.* at 7406 ("I actually think all of the *questions posed about anything related to religion or ethnic background* or their coming from that region of South Asian descent are all questions that have been raised by the Defense . . . .") (emphasis added). Defense counsel pointed out that the prosecutor need not ask questions related to a juror's race because those questions were posed in the juror questionnaires. *Id.* at 7410. The district court rejected that argument because defense counsel had stipulated to those questions. *Id.* at 7413. And on those questionnaires, Mr. Syed volunteered that he was Pakistani. R. 746 at 8718. By stating that defense counsel was himself responsible for asking questions related to a prospective juror's race, the district court found that he had engaged in a line of questioning that the government would be prohibited from initiating.

By requiring that the questions themselves must relate to a juror's race, the district court narrowed *Batson*, and thus placed a more "onerous" burden on Mahbub than one warranted under the law. *Johnson v. California*, 545 U.S. 162, 170 (2005).[14] But, quite simply, there is

---

[14]We recognize that defense counsel also stated that the questions themselves needed to relate to race or ethnicity. *See, e.g.*, R. 716 at 7410 ("What I'm saying is that *Batson* says that if the [g]overnment makes inquiries to the juror about racial and ethnic reasons as one of the factors the Court considers in evaluating if the challenge is appropriate or discriminatory. . . ."); *id.* at 7410–11 ("I think what the *Batson* Court was saying is that if the Government seeking this information from jurors as a basis for peremptory challenge, that is a factor to consider."). To the extent that the defense counsel agreed with the district court that the questions must relate to race or ethnicity, we think it is appropriate to *sua sponte* address this mistake of law. *See, e.g., Rodgers v. Fisher Body Div. Gen.*

more than one way a question can reveal an inference of purposeful discrimination. One way an inference could be established is if the prosecutor asks jurors of different races "contrasting *voir dire* questions." *Dretke*, 545 U.S. at 255. In this case, defense counsel, during *voir dire*, posed a hypothetical scenario in which prospective jurors had children who "might get caught up in something." R. 716 at 7345–46. Ms. Brown and Mr. Syed were the only two jurors who responded to the question in the affirmative. *See id.* at 7345–47. The prosecutor asked Ms. Brown whether her sympathy for people who get caught in "sticky situations" would make her want to give them a "pass." *Id.* at 7378. He further asked her the following question: "Are you willing to give them a pass, maybe they didn't know how to get out of it or are you going to go by weighing the evidence?" *Id.* at 7379. Ms. Brown responded that she would weigh the evidence. *Id.* By contrast, the prosecutor never posed Mr. Syed—the stricken juror who answered similarly to Ms. Brown—the same follow-up question. Even though Mr. Syed uttered an unintelligible response, *see id.* at 7346, the prosecutor apparently thought it was only worth clarifying Ms. Brown's, *see* Appellant Br. 28.

The use of "contrasting questions" here is similar to the questions at issue in *Dretke*, which confirms that the district court's error was plain. In proving purposeful discrimination, the *Dretke* petitioner relied on the prosecutor's use of "contrasting *voir dire* questions posed respectively to black and nonblack panel members, on two different subjects." *Dretke*, 545 U.S. at 255. For example, the prosecutor made statements before asking prospective jurors their thoughts on capital punishment. *Id.* According to the petitioner, "[s]ome of these prefatory statements were cast in general terms, but some followed the so-called graphic script, describing the method of execution in rhetorical and clinical detail." *Id.* This was purportedly "intended . . . to prompt some expression of hesitation to consider the death penalty and thus to elicit plausibly neutral grounds for a peremptory strike of a potential juror subjected to it, if not a strike for cause." *Id.* "If the graphic script is given to a higher proportion of blacks than whites, this is evidence that prosecutors more often than not wanted blacks off the jury, absent some neutral

---

*Motors Corp.*, 739 F.2d 1102, 1106 (6th Cir. 1984), *cert. denied*, 470 U.S. 1054 (1985) (reversing award of damages where defendant's proposed jury instruction failed to accurately state controlling legal principle and defendant failed to raise issue about the correct legal principle on appeal); *see also United States v. Atkinson*, 297 U.S. 157, 160 (1936) ("In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.").

and extenuating explanation." *Id.* After considering the questionnaires and *voir dire* testimony, as well as the prosecutor's explanations, the Court concluded that the "black venire members were more likely than nonblacks to receive the graphic script." *Id.* at 258. The Court referred to the prosecutor's use of contrasting questions as "disparate questioning." *Id.* at 256. *Dretke* counsels that, when determining if an inference of purposeful discrimination exists, an inquiry solely into whether the question posed related to race—like the type of inquiry the district court engaged in here—is deficient.

The district court's error in narrowly reading *Batson* is a mistake of law that does not pass muster under plain-error review.

***

In sum, the district court misstated and misapplied the law in denying the *Batson* challenge. In doing so, it made it more difficult for Mahbub to prevail than the law permits. For this reason, we reverse the district court's ruling and we remand the issue of whether, upon applying the correct legal standard and test, Mahbub's *Batson* challenge requires that the conviction be reversed. *See McAllister*, 693 F.3d at 582.

iv.       *Miscellaneous argument.*

Mahbub also urges us to perform a comparative juror analysis between Mr. Syed and Ms. Brown. Appellant Br. 28. This argument is also unpreserved. *See Crawford*, 60 F. App'x. at 535. Faced with this situation, the Supreme Court has cautioned that a

> retrospective comparison of jurors based on a cold appellate record may be very misleading when alleged similarities were not raised at trial. In that situation, an appellate court must be mindful that an exploration of the alleged similarities at the time of trial might have shown that the jurors in question were not really comparable.

*Snyder v. Louisiana*, 552 U.S. 472, 483 (2008). In *Snyder*, over fifty prospective jurors indicated that they had work or personal commitments that would interfere with their jury service. *Id.* at 476. The government exercised a peremptory challenge to strike a black prospective juror, who purportedly had conflicting work commitments; this would have prompted the juror to achieve a "quick resolution" in this capital case. *Id.* at 482. The Supreme Court concluded that this race-

neutral explanation was implausible because, among other things, another white juror, whose personal obligations were "substantially more pressing," was not stricken. *Id.* at 484. The *Snyder* Court determined that a retrospective comparison was appropriate in that particular case because the purportedly "shared characteristic" was "thoroughly explored by the trial court." *Id.* at 483. Beyond this statement, however, the Supreme Court did not provide any additional guidance as to when it would be proper for an appellate court to conduct a comparative juror analysis when the parties did not raise the alleged similarities between prospective jurors before the district court. Nor is it clear from the Supreme Court's opinion as to what constitutes a "thorough[] explor[ation]" of a particular issue. *See id.*

Because we conclude that remand is appropriate for separate reasons, we need not decide whether a comparative juror analysis is appropriate here. In any event, our case law explains that this court is by no means compelled to conduct a comparative juror analysis when a defendant failed to preserve the issue. *Cecil*, 615 F.3d at 687 ("If neither party argues for such analysis to prove or disprove purposeful discrimination, the district court's failure to undertake it is not necessarily reversible error.").

## B.      Jury Instruction

For the first time on appeal, Mahbub argues that the district court's jury instruction concerning the element of criminal conspiracy was erroneous. Appellant Br. 33–38. Thus, this issue is unpreserved. Mahbub concedes that the plain-error standard of review applies here. *Id.* at 38–39; *see also United States v. Morrow*, 977 F.2d 222, 226 (6th Cir. 1992) (en banc). Plain error "requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Semrau*, 693 F.3d 510, 528 (6th Cir. 2012).

The district court used the Sixth Circuit Pattern Criminal Jury Instruction § 3.03, which, in relevant part, stated as follows:

> If you are convinced that there was a criminal agreement, then you must decide whether the Government has proved that the Defendant knowingly and voluntarily joined the agreement. To convict the Defendant, the Government

must prove that she knew the conspiracy's main purpose and that she voluntarily joined it intending to help advance or achieve its goals.

This does not require proof that the Defendant knew everything about the conspiracy or everyone else involved in it, or that she was a member of it from the very beginning. Nor does it require proof that the Defendant played a major role in the conspiracy or that her connection to it was substantial. A slight role or connection may be enough.

But proof that the Defendant simply knew about a conspiracy or was present at times or associated with members of the group is not enough, even if she approved of what was happening or did not object to it. Similarly, just because the Defendant may have done something that happened to help a conspiracy does not make her a conspirator.

R. 720 at 8064–65. Mahbub contends that the jury instruction lowers the burden of proof to support a conviction. Appellant Br. 34 (citing *Sullivan v. Louisiana*, 508 U.S. 275 (1993)).

Mahbub's contention lacks merit. The instruction states, and the district court read, "[a] *slight role* or connection may be enough" to link a defendant to a conspiracy, which is an accurate legal proposition. *See United States v. Price*, 258 F.3d 539, 544 (6th Cir. 2001) ("The connection of the defendant to the conspiracy need only be slight, if there is sufficient evidence to establish that connection beyond a reasonable doubt."); *United States v. Betancourt*, 838 F.2d 168, 174 (6th Cir. 1988) ("The existence of a connection to the conspiracy must be shown beyond a reasonable doubt, but the importance of the connection need not be great."). To the extent that the disputed language lowers the burden of proof to support a conviction, we note that "no single provision of the jury instruction can be read in isolation;" instead, "the charge must be considered as a whole." *United States v. Horton*, 847 F.2d 313, 322 (6th Cir. 1988). In this case, the district court made it abundantly clear that the reasonable-doubt standard applied in determining whether Mahbub should be found guilty of criminal conspiracy: "You must be convinced that the Government has proved all of these elements beyond a reasonable doubt in order for you to find the Defendant guilty of the conspiracy charge." R. 720 at 8061, 8071.

In support of Mahbub's argument that the jury instruction was erroneous, Mahbub relies on a concurring opinion in *United States v. Huezo*, 546 F.3d 174, 184 (2d Cir. 2008) (Newman, J., concurring). In that case, the concurring opinion contends that the use of the term "slight evidence" in the following legal proposition lowers the burden of proof required to support a

conspiracy conviction: "Once a conspiracy is shown, only slight evidence is needed to link another defendant with it." *Id.* at 184.  Even references to "slight *connection*"—i.e., like the district court's instruction here that a "slight . . . connection" to a conspiracy is enough to support a conviction—"inevitably create[s] the risk of lowering the standard of proof significantly below 'beyond a reasonable doubt.'" *Id.* at 189.  Without taking any stance on the merits of the concurring opinion's position, we cannot conclude that the use of a jury instruction that finds support in Sixth Circuit case law, *Price*, 258 F.3d at 544, constitutes plain error.

###    C.    Ineffective assistance of counsel

Mahbub also asserts that her counsel rendered ineffective assistance of counsel for failing to object to the jury instruction containing the "slight connection" language.  Appellant Br. 41.  To prevail on this claim, Mahbub must satisfy the two-prong test established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984): (1) the defendant's counsel's performance was deficient, or put differently, "fell below an objective standard of reasonableness"; and (2) the performance prejudiced the defendant.  "Ordinarily we will not review a claim of ineffective assistance of counsel on direct appeal"—as is the case here— "because the record is usually insufficient to permit an adequate review of such a claim." *United States v. Wynn,* 663 F.3d 847, 850 (6th Cir. 2011).  Instead, it is more appropriate to raise these claims in a post-conviction proceeding under 28 U.S.C. § 2255.  *United States v. Catchings*, 708 F.3d 710, 715 n.3 (6th Cir. 2013).

In this case, however, the ineffective-assistance-of-counsel claim is predicated on Mahbub's counsel's purported failure to object to the jury instruction, which, as shown above, was consistent with Sixth Circuit case law.  *Price*, 258 F.3d at 544.  Because Mahbub's ineffective-assistance-of-counsel argument is contingent on her successful challenge of the jury instruction, it too is meritless.  *United States v. Jones*, 489 F.3d 243, 255 (6th Cir. 2007) (holding that defendant was not entitled to relief on ineffective-assistance-of-counsel claim because underlying claim was resolved on the merits).

**D.      Sentencing**

Mahbub next challenges the district court's imposition of her 46-month sentence.

**1.        Calculation of Loss**

Mahbub contends that the district court incorrectly calculated the monetary loss that should be attributed to her.  Appellant Br. 55.  According to Mahbub, she was "personally . . . paid $33,000,"[15] and the district court should have imposed a six-level increase to her offense level rather than an eighteen-level increase.  *Id.* at 60.  Mahbub's applicable guideline range would have been, therefore, 15–21 months.  *Id.* at 61.  The district court, however, estimated the entire loss to be between $2.5 million and $7 million.  R. 722 at 8187.  This rendered an applicable guideline range of 63-78 months.  In the end, Mahbub was sentenced to forty-six months.  R. 682.

We review a district court's calculation of the amount of loss for clear error.  *United States v. Blackwell*, 459 F.3d 739, 772 (6th Cir. 2006).  To challenge this calculation, Mahbub must "carry the burden of demonstrating that the court's evaluation of the loss was not only inexact but outside the universe of acceptable computations." *United States v. Raithatha*, 385 F.3d 1013, 1024 (6th Cir. 2004), *vacated and remanded on other grounds*, 543 U.S. 1136 (2005) (internal quotation marks omitted).  When determining the amount of loss for sentencing purposes, "a defendant will be held accountable for the actual or intended loss to a victim, whichever is greater, or a combination thereof." *Id.* (citing *United States v. Wade*, 266 F.3d 574, 586 (6th Cir. 2001)); *see also* U.S. Sentencing Guidelines Manual § 2B1.1 n.3(A)(ii).  "[S]o long as the intended loss is supported by a preponderance of the evidence, the district court may use it in reaching the appropriate offense level." *Raithatha*, 385 F.3d at 1024 (quotation omitted).  The Sentencing Guidelines clarified that "intended loss" "includes intended pecuniary harm that would have been *impossible* or unlikely to occur." *Id.* (quoting § 2B1.1, comment. n.3(A)(ii)) (emphasis added).

During the sentencing hearing, the district court relied on the stipulations provided by Mahbub's counsel in order to conclude that the loss amounts exceeded $2.5 million but were less

---

[15]Presumably, this amount reflects the total amount Mahbub was paid during her tenure at All American.

than $7 million.  R. 722 at 8186–87.**[16]**  In this instance, reliance on this stipulation was not clear error.  *See, e.g.*, *United States v. Davis*, 74 F.3d 1241, 1996 WL 15622, at *4 (6th Cir. Jan. 16, 1996) (noting that defendants could not contest court's determination of relevant total loss in part because of their "stipulat[ion] to the amount of loss in pretrial proceedings") (unpublished table decision); *see also United States v. Sloan*, 492 F.3d 884, 893 (7th Cir. 2007) ("By stipulating to the loss amount, he effectively admitted the fact that the loss amount was $19,654.60 and waived any subsequent challenge to this fact.").  Further, the court did not need to rely on the amounts that Mahbub personally received to calculate loss under § 2B1.1 of the United States Sentencing Guidelines.  *United States v. Wilkins*, 308 F. App'x 920, 929 (6th Cir. 2009) ("Here, actual loss included not only the amount of proceeds defendant himself pocketed, but also the amount of loss resulting from the entire scheme.").

### 2.    Sentence Disparity

Mahbub also argues that the district court's sentence creates a disparity between Mahbub and the other two defendants indicted in the same conspiracy, Mohammed Shahab and Hassan Akhtar.  *See* Appellant Br. 56.  Specifically, Mahbub argues that Akhtar's sentence is twenty months shorter than Mahbub's sentence yet he was "second in command under Shahab" and "received kickbacks from therapists, forged a doctor's signature, and laundered money."  *Id.* at 57.  Meanwhile, Mahbub argued that Shahab was the "mastermind[]" as he was the owner of eight companies and defrauded Medicare of more than $18 million.  *Id.*  He, however, received a sentence of fifty months—four months longer than Mahbub's.  *See id.*

---

**[16]**The colloquy on this point occurred as follows:

> THE COURT: And do you think that during the trial, the amount of all the billings made during the time she was there is part of the evidence.
> GOVERNMENT: The billings during the time she was there, she stipulated to it.
> THE COURT: And that's the 5.8
> DEFENSE COUNSEL: We stipulated that the company billed Medicare in these amounts.
> GOVERNMENT: And stipulated to the time frame she was there.
> She stipulated she received checks from 2008 to September 2009.
> THE COURT: That is an amount more than 4.6
> DEFENSE COUNSEL: It is.  It is still less than 7, but more than 4.6

R. 722 at 8186–87.

We review the reasonableness of a sentence under the abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 56 (2007). "A sentence is substantively unreasonable if the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Camiscione*, 591 F.3d 823, 832 (6th Cir. 2010).

Here, although 18 U.S.C. § 3553(a)(6) identifies "the need to avoid unwarranted sentence disparities" as a factor at sentencing, we have previously explained that "this factor concerns *national* disparities between defendants with similar criminal histories convicted of similar criminal conduct—not disparities between co-defendants." *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008) (citing *United States v. Simmons*, 501 F.3d 620, 623–24 (6th Cir. 2007)). The district court was simply not required to consider Mahbub's sentence in light of sentences imposed on Akhtar and Shahab. "A district judge, however, *may* exercise his or her discretion and determine a defendant's sentence in light of a co-defendant's sentence." *Simmons*, 501 F.3d at 624. That is what the district court did here. Even though Mahbub's "leadership" role warranted a two-level enhancement under § 3B1.1, it declined to apply it after Mahbub's trial counsel argued that Maria Suleman—another clinic office manager—did not receive that same enhancement. *See* R. 722 at 8177–8181; *id.* at 8211 ("I don't think, to be consistent with the participation of her and Ms. Suleman, there should not be any points given for adjustment for [her] role in the offense. . . ."). Put another way, the district court's effort to avoid sentencing disparities only benefitted Mahbub. In this regard, the imposition of the sentence was not substantively unreasonable. We also note that Mahbub's 46-month sentence is below the 63-78 months range calculated by the district court. R. 722 at 8213. Defendants who seek to prevail on a substantive-reasonableness challenge to a below-guidelines sentence "bear a heavy burden"—a point Mahbub concedes—but she simply failed to carry that burden here. *United States v. Greco*, 734 F.3d 441, 450 (6th Cir. 2013); Appellant Br. 55.

### 3. Offer to cooperate

Mahbub next contends that she is entitled to a lesser sentence because the government "declined her offer to cooperate." Appellant Br. 60. So, she argues she should have received a one-level reduction in her offense level. But because Mahbub offers no legal argument in

support of this position and fails to identify the applicable guideline provision upon which she relies, we decline to consider this argument. *See McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").[17]

## III.   CONCLUSION

For the reasons stated above, we **AFFIRM** the district court in every respect except for the *Batson* ruling.  We **REMAND** the case to the district court for a proper determination of whether there is an inference that the government engaged in purposeful discrimination.  If so, the district court must proceed to the subsequent steps of the *Batson* inquiry to determine whether a new trial is warranted.

---

[17]Another argument that Mahbub makes is that the district court should not have increased her offense score by two levels for being a manager because she was "at the bottom of the organizational chart."  Appellant Br. 60.  This argument is without merit, as the district court did not add a two-level enhancement for her role.  R. 722 at 8211.  Mahbub later acknowledges in her reply brief that she did not receive a two-level enhancement.  Reply Br. 9.